1

2

3

4

# UNITED STATES DISTRICT COURT

5

## EASTERN DISTRICT OF CALIFORNIA

6

7   FRANCISCO OROSCO GARCIA,                )       1:08-CV-01819 AWI JMD HC
                                            )
8                    Petitioner,            )       FINDINGS AND RECOMMENDATION
                                            )       REGARDING PETITION FOR WRIT OF
9        v.                                 )       HABEAS CORPUS
                                            )
10  WARDEN M.S. EVANS,                      )
                                            )
11                   Respondent.            )
    _____)

12

13          Francisco Orosco Garcia ("Petitioner") is a state prisoner proceeding *pro se* with a petition

14  for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

15                              **PROCEDURAL HISTORY**

16          Petitioner is currently in the custody of the California Department of Corrections and

17  Rehabilitation pursuant to a July 13, 2004, jury verdict, finding Petitioner guilty of first degree

18  murder (Cal. Penal Code § 187), torture (Cal. Penal Code § 206), conspiracy (Cal. Penal Code §

19  182), and kidnaping (Cal. Penal Code § 207(a)).  (Answer at 1; Pet. at 1.)  Petitioner was sentenced

20  to life without the possibility of parole.

21          Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District,

22  which issued a reasoned opinion on October 19, 2007, affirming Petitioner's conviction.  (*See* Lod.

23  Doc. 9.)[1]

24          Petitioner filed a petition for review with the California Supreme Court on November 20,

25  2007.  (Lod. Doc. 12; Answer at 2.)  The California Supreme Court denied the petition on January

26

27  _____

28          [1]Petitioner also filed a petition for rehearing with the Court of Appeal. (Lod. Doc. 10; Answer at 2).  The appellate
    court denied the petition for rehearing on November 9, 2009.  (Lod. Doc. 11).

1   30, 2008.  (Pet. at 3; Lod. Doc. 13).[2]

2          On November 26, 2008, Petitioner filed the instant federal petition for writ of habeas corpus.

3          On May 18, 2009, Respondent filed an answer to the petition, to which Petitioner filed a

4   traverse on August 18, 2009.[3]

5                          **FACTUAL BACKGROUND**[4]

6          At approximately 6:30 p.m. on October 1, 2002, Isabel Valdes, a farm laborer
living at a labor camp with about a dozen other people, observed a group of five men
7   enter the camp carrying a total of two handguns and a rifle. Those present in the camp
were moved outside and ordered face down on the ground. They were told they would
8   be killed if they did not get down on the ground. The group asked for Roberto and
Julian. Roberto Ramirez (the victim herein) said "here I am." Two men took the
9   victim away. During the encounter two other people were hit across the head with a
handgun. The entire incident took about 10 minutes. Valdes could not describe the
10  men. Valdes testified that the men left in a four-door green vehicle. Valdes recognized
exhibit 103 (a rifle seized from Eulalio Mendoza, a.k.a. Pelon) as looking like one of
11  the weapons he saw that evening. The people at the camp did not call the police
because they were afraid.

12
         Scott Rufer, an abuser of drugs, rented a house in Merced. His home was a
13  place where various people would come to use drugs. David Medina (David) slept on
the couch in the house and his brother, Ramon Medina (Ramon), was an occasional
14  overnight guest.

15         On October 1, 2002, at 8 or 9 p.m., David and Rufer were watching television
in Rufer's house when a car pulled up in the driveway. David walked to the front door
16  when the car arrived. Rufer testified that five people got out of the car and one of
them had a pillowcase over his head. The other four men escorted the victim to one of
17  the back bedrooms.

18         Rufer testified that, when the group entered his home, David spoke to them in
Spanish and then told Rufer to sit on the couch, not to move, not to look, and not to
19  breathe. David was armed and unplugged all of the telephones. Ramon arrived after
the group of men arrived. Ramon was armed with a shotgun or rifle.

20
         The group stayed in the back room approximately 20 to 25 minutes. The men

21

22         [2]Respondent admits that Grounds 1, 4, and 5 have been exhausted by Petitioner but contends that claims 2 and 3
23  are not "technically" exhausted.  (Answer at 2.)

24         [3]While Petitioner labels the document as a "denial and exception to the return to the order to show cause," it is clear
that the document is Petitioner's reply to Respondent's answer.  (Court Doc. 23).  Thus, the Court construes this document
25  to be Petitioner's traverse.

26         [4]These facts are derived from the California Court of Appeal's opinion issued on October 19, 2007.  (*See* Lod. Doc.
9.)  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is
27  presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1);
*see Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *Moses v. Payne*, 555 F.3d 742, 746 n. 1 (9th Cir. 2009).  Here,
28  Petitioner has not presented evidence that would permit the Court to set aside the presumption of correctness that has attached
to the State court's factual findings.

came out of the back room occasionally during this time. David told Rufer that the victim was a snitch.

An old gray four-door car pulled up and the men left with the victim. Rufer and David remained at the house.

Rufer had no idea until months later of what happened to the victim. Rufer identified Eulalio Mendoza (a.k.a. Pelon[5]) as one of the four men who arrived with the victim. Pelon was a friend of the Medina brothers (David and Ramon). Rufer identified Garcia from a photo lineup on February 2003 as one of the men who was in the group that arrived with the victim. Rufer picked out Santana on the day he testified as one of the people in the group of men who accompanied the victim into Rufer's house. On cross-examination, Rufer said he saw Santana that evening but he was not positive if Santana was with the group. Rufer recognized Mendoza but was not sure if he was at his house with the group of men.

David was originally charged with murder. He entered a plea to false imprisonment and served six months in jail. He testified for the prosecution. David was living with Rufer in October of 2002. On October 1, 2002, he saw car lights. Three men walked into the house. One of the men had his head covered with a shirt or some other material. The other two men were armed. David did not know what was happening. David was told to stand by the door and not let anyone in the house. He did as he was told. The men went into the bedroom and remained there for 20 to 30 minutes. David's brother Ramon was there. The men came out of the room, a car pulled up, and the group got in the car and left. David did not know if Ramon ever went into the room where the men were with the victim. David recognized Garcia as one of the men who was with the victim. In addition, he testified that Pelon was the other man who accompanied the victim into the house.

Ramon was also charged with murder but pleaded guilty to false imprisonment and kidnapping. He received a jail term for his convictions. Ramon testified that he was staying at Rufer's house in October of 2002. Pelon was at the house earlier in the day on October 1, 2002, acting weird and nervous. Later in the day Pelon, Garcia, Mendoza, and Santana arrived at the house in a gray car (pictured in People's exhibit 15). They arrived with the victim. The victim was bleeding.

Ramon testified that the four men escorted the victim to the back room. They all had weapons, including a rifle and handguns. Santana and Mendoza left. Pelon came out and demanded that Ramon go in the back room. He complied. Ramon saw Pelon kicking the victim in the stomach, ribs, and back. Garcia pistol-whipped the victim on the forehead. Garcia asked the victim questions, including questions about "Queenie" and asked him where certain people were. Pelon and Garcia yelled at the victim. The victim was crying and hurting. He had tears and blood coming down his face. The victim asked them to quit.

Pelon went to the kitchen while Ramon and Garcia remained in the room with the victim. Ramon was sitting in a chair holding the rifle that Pelon handed to him. Ramon held the gun because Pelon demanded that he hold it.[6] Pelon had a handgun in his other hand. Pelon, Garcia, and the victim were in the back room between 45

---

[5] We will refer to Eulalio Mendoza as Pelon in order to distinguish him from defendant Mendoza.

[6] Ramon was shown a weapon at trial and asked if it was the weapon he was holding. He said yes. The record does not reflect the exhibit number of the weapon or the type of weapon that was shown to Ramon.

minutes to an hour. Ramon testified that he was only in the room for 25 minutes. The victim was curled up on the bed.

The same car that was used to bring the victim to the house was used to take the victim away. The victim was led out of the house with his face covered with a shirt. Ramon testified that the car belonged to Mendoza. Pelon told those remaining in the house to clean up. They did.

On cross-examination by Santana's attorney, Ramon was asked if he knew Sylvia Brown. He said he had "smoked dope" with her. He was asked if he had told Sylvia Brown that he had set up Santana. Ramon denied saying that to Sylvia Brown.

Maria Bustos (a.k.a. Lupe) lived in a room with her boyfriend at Rufer's home. On October 1, 2002, Rufer, Ramon, David, Pelon, and Bustos were present at the home. According to Bustos, Pelon seemed desperate, as if he was waiting for something. Four men arrived in a four-door car. The men pulled a person out of the car with his eyes covered by clothing. Pelon and Garcia took the victim into the house. The other two men remained outside and left. Garcia had a gun and was holding on to the victim. Ramon had a gun.

Bustos was told to go outside. She did. The men remained in the house for 30 to 60 minutes. The victim was then led outside by Garcia, David and Ramon. Pelon remained inside and called Bustos inside. Once inside Pelon told Bustos to clean up the blood. When the victim was brought inside he was wearing sandals and socks. When he left he was only wearing socks. Ramon kept the victim's sandals.

Merced Irrigation District employees were spraying the canal banks on October 4, 2002, when they saw something floating in the water. They determined that the object was a human body and called law enforcement.

Deputy Sheriff Gerald Dover arrived at the scene. The body was removed from the water. The arms of a shirt had been wrapped around the victim's neck and tied. Five expended shell casings were found on the canal bank. There were shoe impressions in the dirt.

Dr. James Wilkerson conducted an autopsy on the victim, Roberto Ramirez. A black Ramon was shown a weapon at trial and asked if it was the weapon he was holding. He said yes. The record does not reflect the exhibit number of the weapon or the type of weapon that was shown to Ramon. shirt was tied around the victim's neck. It appeared that the shirt had been worn as a hood. The victim had suffered six gunshot wounds. One wound began at the upper chest, another one to the chest, another to the lower chest, one through the arm, one to the left buttocks, and the final gunshot wound was to the upper left thigh. The wounds were excessive for the purpose of killing someone. The cause of death was multiple gunshot wounds.

In addition to the gunshot wounds, the victim had blunt force injuries to his face and groin. The victim had a laceration to the bridge of his nose and a cut above his left eye. He had bilateral injuries to his groin with the bruise on one side of the groin larger and more purple than the other side. These wounds were inflicted before the victim was shot. The bruises were large and characterized as severe. The doctor testified that it would take significant force to cause the bruising. It appeared from the size of the bruises that the victim was unaware that he was going to receive the blows to his groin. A groin injury is probably the most painful injury a man can receive. The victim suffered at least two blows to his groin.

The victim had alcohol and methamphetamine in his system when he died. Four expended bullets were removed from the victim during the autopsy.

On October 11, 2002 Oakland police officer Allen Miller found a car in an apartment building parking lot in a high crime area. The car was dusty and had been sitting there awhile. The car was returned to Merced County.

Mario Naranjo said he sold the car on May 9, 2002 to two people, Mendoza and his brother Fortino Mendoza. The payments were brought in each month. Sometimes the payments were made by defendant Mendoza, sometimes by Fortino.

The car was searched and checked for fingerprints. Blood was found in the car. Latent print analyst Richard Kinney processed the vehicle. He lifted 22 print cards. Mendoza's fingerprints were on a can of Red Bull found in the car and a container of Prestone interior cleaner. Garcia's prints were on the inside passenger rear window as well as on a cognac bottle. The fingerprint analyst was only asked to compare the prints of four people (Garcia, Mendoza, Santana, and Pelon) to the prints taken from the car and its contents.

Eight stains inside the car were tested for blood and were positive. Two of the stains were then tested for a DNA profile. The profile of the blood stains matched the victim's and would occur in one in 630 billion Hispanics. DNA on cigarette butts taken from the car matched Mendoza.

Isais Fierros knows the three defendants. Mendoza is Fierros's cousin, he is related to Santana, and he knows Garcia. On October 5, 2002 Fierros went to the Atwater Police Department to report a matter he had telephoned about on October 3 and 4. He told the police that Garcia had tried to take his child and that Mendoza had called him and demanded that he provide him with $50,000. Fierros told the police that Mendoza said he had killed someone in Merced and needed the money to get out of town. Fierros laughed when Mendoza said he was going to kill him. Fierros said that when Mendoza called him the next day and repeated the demand, he took him more seriously. Fierros did not go to the police until "they" attempted to take his child.

Fierros left the police department after making his report. Later that day, Fierros called 911 because Mendoza was following him and he was afraid. Mendoza was taken into custody. Officers found a loaded firearm under the passenger seat of the car he had been driving.

Fierros talked to Mendoza at the direction of the police department. When Fierros asked Mendoza what he had done in Merced, Mendoza replied, "That's nothing." Fierros told Detective Dover that Garcia mentioned that "they" had killed someone. Fierros agreed to wear a wire for the police and talk to Garcia. Fierros asked Garcia if the guns had been disposed of. Garcia said "they had thrown them away."

On cross-examination, Fierros began to change his story. He said that Mendoza wanted the money for Pelon's bail. He testified that he made up stories for the police because he was concerned about his child and he wanted to get Garcia and Mendoza off the street. When he first called the police to tell them that someone had tried to take his child, the officer told him he was not a babysitter and he should make his report in person. Fierros was angry enough with Garcia to tell lies about him and to kill him. Fierros wanted Garcia arrested and off the streets. Fierros told police that Mendoza's car might be found in Oakland, but Fierros did not drive the car there. Fierros testified that Garcia did not confess a murder to him, but perhaps he (Fierros)

gave that impression to the police because he needed the police to get Garcia locked up. Fierros testified that Mendoza never asked him for money because of a murder. Fierros was angry with Mendoza and wanted him off the streets. Fierros said he was telling the truth now in court.

On redirect examination, Fierros starting repeating the version of events he told on cross-examination. He testified that Mendoza did call him and ask him for money but Mendoza did not say he was going to kill Fierros nor did Mendoza tell Fierros he had killed a man in Merced. Fierros made up a lot of things he told police with the purpose of getting Mendoza and Garcia off the streets.[7]

Atwater police officer Aaron McKnight testified that he met Fierros in the lobby of the police station at 9:35 a.m. on October 5, 2002. Fierros had called the police department on October 3d, and October 4th. Fierros told Officer McKnight that Mendoza had called him and wanted $50,000 because he had killed a guy and he needed to flee. Fierros told McKnight that Mendoza said he would kill him if he did not come up with the money. Fierros was afraid of Mendoza and also afraid of Garcia because Garcia associated with Mendoza and Fierros thought Garcia was looking for him to do him harm.

Sergio Torres lived in Merced in October of 2002. He knew Garcia and Mendoza from Mexico and met Santana in the United States. Garcia called Torres before October 11, 2002, and asked him to come to his hotel and to bring beer and food. Torres went to the hotel room. Torres was accompanied by his girlfriend, and Garcia's girlfriend was also present. Torres and Garcia drank beer and consumed methamphetamine. When the women went to the store, Garcia told Torres that he, Mendoza, Santana, and Pelon had kidnapped a man, took the man to a house in Merced, and then took the man outside Merced to a canal bank. Mendoza made the victim sit on the canal bank. Garcia told Torres that Mendoza shot the man first and Garcia shot him after Mendoza shot him. Garcia was not sure if he hit the man with his shot. After the victim was shot he fell into the water. Garcia told Torres that they used Mendoza's car.

Garcia told Torres that when they were driving back from the canal they let Santana out of the car because he was scared and did not want to be with them anymore.

Torres testified that he has a methamphetamine problem and has been in trouble with the law. At the time he testified he had three cases pending. Torres's attorney went to law enforcement and said Torres had information he would provide in exchange for a better disposition. Torres talked to law enforcement about what Garcia told him with the hope that he would get help with his own legal problems. He reached an agreement with the prosecution. Charges pending against him were reduced and he was also given help to move away.

On cross-examination Torres disclosed more details about his deals with the

---

[7]At this point in the proceeding, and in front of the jury, the prosecutor asked for permission to question Fierros with leading questions because he was now a hostile witness. Counsel for Garcia stated that perhaps counsel should be appointed for Fierros. The prosecutor responded that he thought counsel should be appointed, "because this is getting into perjury territory." He repeated his concern about perjury. A discussion was held in chambers. Fierros said he did not wish to answer any more questions on Fifth Amendment grounds, "otherwise I could get in trouble." The court told the jury that Fierros exercised his Fifth Amendment right and was not going to testify anymore. The discontinuation of Fierros's testimony and the issues surrounding it will be discussed under part V.

prosecution. He was arrested on May 25, 2001 with a pound of methamphetamine. He reached a plea agreement in April of 2002. He pled guilty to possession of methamphetamine with the agreement that he would receive no more than 16 months in prison. Between the time of his plea and before sentencing Torres was cooperating with law enforcement to bring them information in the hopes that his sentence would be less than 16 months. His case was continued in July and August. Torres kept asking for more time to gather information. He had not found any information to pass on to law enforcement in October of 2002.

On February 5, 2003, Torres finally came forward with the information he had received from Garcia in October of 2002. In May of 2003 Torres agreed to testify in Garcia's case. In the interim, Torres was arrested in March of 2003 for possession of a handgun. He testified at Garcia's preliminary hearing and was released from jail that day. His new felony charges were reduced to misdemeanors and he received a promise of financial assistance to relocate. He was arrested again in June and August of 2003 and during the current trial in June and July of 2004. He had five cases pending. His cases had been continued with the hope that he would get favorable treatment from the district attorney's office. Torres testified that he came forth with his story regarding Garcia in February of 2003 because Garcia and the other defendants were in jail and he felt safe.

On February 26, 2003 all three defendants were in custody and scheduled for a court appearance. They were transported in a van that had been outfitted with several recording devices. Garcia and Mendoza were placed in the van first. Santana joined them several minutes later.

A tape of the recording was played to the jurors. In the tape Mendoza asked Garcia what he knew and who was talking. Garcia said they are taking fingerprints of everyone who was in the car. Garcia told Mendoza that he told police that they are cousins and sometimes Mendoza would give him a ride to the store. Garcia also said that the police were asking if he knew Pelon and Santana. Mendoza suggested that they say that they do not know anything. Garcia said that is what he has already told them. Mendoza said they should get a lawyer for whomever they find the most fingerprints for. Garcia reported to Mendoza that Rudy and "Queen" (Fierros) were talking and that Santana "is doing well with him [Fierros]." Garcia and Mendoza discussed guns. Garcia said the police got a gun from him and had the gun found in Mendoza's possession. Garcia told Mendoza the police said they had proof who did it and Garcia asked to see the proof.

Garcia continued the conversation and asked why they should pay when they had not done anything. He accompanied this comment with laughter. Santana entered the van. Santana reported to the other two that the "old man" and Ms. Lupe are the ones who were saying everything. Garcia said it's not the old man, it is Ms. Lupe, Santana's pal Rudy and "Tupu" (Torres).

Santana asked where Pelon was. Garcia and Mendoza responded they did not know. Santana suggested they call his "lady" to find him. Garcia said he already knew. Santana suggested that Pelon "could tie those dummies." Garcia said they could not do anything now or they would dig their hole deeper.

The three discussed how cases would go if there was not any evidence. Mendoza asked what was up with "Quini" [Fierros' nickname was Queenie]. Garcia said he did not know where he was. Santana said that "Quini" said he was not going to say anything. Santana said "they" saw Juan, "you guys" [Mendoza and Garcia], and Pelon. Garcia said he told them he would go there for crack. Occasionally throughout

the conversations they indicated that they had not done anything.

The three then discovered the listening devices. Garcia said they did not do anything. Mendoza said they should look for the person who did "that." Garcia said they have us here and the person who did it is out. Santana said they don't have any evidence but they are putting it in the paper so they can come and see who did it. Garcia said they aren't going to find evidence because they weren't the ones who did it.

When Ramon Medina testified, he was asked on cross-examination if he had told Sylvia Brown (Sylvia) that he had set up Santana. Ramon replied that he had not. Based on this cross-examination, the district attorney's office investigated calls made by Sylvia's husband, John Brown (John). John was a cellmate of Santana's in jail. This investigation resulted in Sylvia's testifying at trial.

John and Santana were housed in the same cell in the jail. John was allowed to leave jail for one week on a pass. He returned to jail on May 23, 2004 and continued to share a cell with Santana until his removal on June 22, 2004. John's removal from Santana's cell occurred during the trial in this case.

Sylvia testified that when John was out of jail on a one week pass he told her that Santana wanted her to keep Ramon from testifying. Before the plan was put into action, Ramon had already testified. Santana changed his plan and wanted Sylvia to lie and say that Ramon had set Santana up. John and Sylvia were under the belief that they would be paid for doing this.

Sylvia told Santana's investigator that she saw Ramon, and Ramon told her that he had set up the three defendants. When Santana's defense counsel disclosed this information to the district attorney, the district attorney began an investigation.

Sylvia was interviewed by Detective Dover. In her first interview she lied and stuck to her original story that she had seen Ramon. In her second interview with Dover, he confronted her with the tapes of the conversations among Sylvia, John, and Santana in jail. Sylvia then said the story about Ramon was a lie. Sylvia agreed to testify for the prosecution in exchange for a two-year suspended sentence for conspiracy to commit perjury. Santana and John were the alleged coconspirators.

The tape of the telephone conversation among Sylvia, John, and Santana was played for the jury. The telephone call began between Sylvia and John. John told Sylvia that Ramon had already testified, so if Sylvia wanted to come forward and say that Ramon was lying that would be good. Sylvia asked questions of John, and John asked Sylvia if she wanted to talk to Santana. She said yes, and John summoned Santana to the telephone. Sylvia and Santana spoke in Spanish. Sylvia explained to Santana that she knew him from before and that she is John's wife. Sylvia told Santana that if he needed her to go to court she would go. He said yes. Santana said he was there because of Ramon and La Bomba (Torres). Santana said, "That their [ sic ] telling lies." Sylvia said whatever you need me to do, I'll do. Santana said that if Sylvia did "us" that favor, he would greatly appreciate it. Santana said he already told "him" of the appreciation that he was going to give her. Santana wanted Sylvia's name and address so he could give it to his attorney. Sylvia told Santana that John could provide him all of her details. Santana told Sylvia that when his attorney talks to her she should tell him that the guy told pure lies and that is why he was hiding. Santana also asked Sylvia to look for other girls who know that "they" are liars to come and testify. Santana said he would get in agreement with Sylvia's husband and he appreciated what Sylvia was doing.

1    Sylvia then spoke to John and told him to give Santana her name and address
2    so he could send his lawyer over. She also said she would get other people to back
     him up.

3    The parties stipulated that the bullets recovered from the victim were fired
     from the same weapon. It was also stipulated that the weapon used to kill the victim
4    was not the gun seized from Garcia when he was arrested, it was not the gun seized
     from Mendoza when he was arrested, nor was the murder weapon Pelon's rifle. In
5    addition, the ammunition seized from Santana's home on February 14, 2003, pursuant
     to a search of his house, was not associated with the death of the victim.
6
     Garcia was arrested at a restaurant. Garcia struggled when he was arrested and
7    had a gun in his waistband of his pants. Garcia got his hand on one of the officer's
     service weapons during the struggle. The struggle was described as a life or death
8    struggle, lasting three to four minutes and requiring five people to take Garcia into
     custody.
9

10   (Lod. Doc. 9 at 2-14.)

11                                    **DISCUSSION**

12   **I.     Jurisdiction**

13       A person in custody pursuant to the judgment of a state court may petition a district court for

14   relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or

15   treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529

16   U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by

17   the U.S. Constitution.  While Petitioner is currently incarcerated at Salinas Valley State Prison in

18   Soledad, California,[8] Petitioner's custody arose from a conviction in the Merced County Superior

19   Court.  (Pet. at 2.)  As Merced County falls within this judicial district, 28 U.S.C. § 84(b), the Court

20   has jurisdiction over Petitioner's application for writ of habeas corpus.  *See* 28 U.S.C. § 2241(d)

21   (vesting concurrent jurisdiction over application for writ of habeas corpus to the district court where

22   the petitioner is currently in custody or the district court in which a state court convicted and

23   sentenced the petitioner if the state "contains two or more Federal judicial districts").

24   \\\

25   \\\

26   \\\

27   _____

28       [8]The city of Soledad falls within Monterey County, which is within the jurisdiction of the Northern District of
     California.  *See* 28 U.S.C. § 84(a).

1    **II.      ADEPA Standard of Review**

2          On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of

3    1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

4    enactment.  *Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499

5    (9th Cir. 1997) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996), *overruled on other*

6    *grounds by Lindh*, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's

7    enactment)).  The instant petition was filed in 2008 and is consequently governed by the provisions

8    of the AEDPA, which became effective April 24, 1996.  *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003).

9    Thus, the petition "may be granted only if [Petitioner] demonstrates that the state court decision

10   denying relief was 'contrary to, or involved an unreasonable application of, clearly established

11   Federal law, as determined by the Supreme Court of the United States.'"  *Irons v. Carey*, 505 F.3d

12   846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)); *see Lockyer*, 538 U.S. at 70-71.

13         Title 28 of the United States Code, section 2254 remains the exclusive vehicle for

14   Petitioner's habeas petition since Petitioner is in custody of the California Department of Corrections

15   and Rehabilitation pursuant to a state court judgment.  *Sass v. California Board of Prison Terms*,

16   461 F.3d 1123, 1126-1127 (9th Cir. 2006) (quoting *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir.

17   2004) in holding that, "[s]ection 2254 'is the exclusive vehicle for a habeas petition by a state

18   prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging

19   his underlying state court conviction'").  As a threshold matter, this Court must "first decide what

20   constitutes 'clearly established Federal law, as determined by the Supreme Court of the United

21   States.'"  *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly

22   established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the

23   Supreme Court's] decisions as of the time of the relevant state-court decision."  *Id*. (quoting

24   *Williams*, 592 U.S. at 412).  "In other words, 'clearly established Federal law' under § 2254(d)(1) is

25   the governing legal principle or principles set forth by the Supreme Court at the time the state court

26   renders its decision."  *Id*.  Finally, this Court must consider whether the state court's decision was

27   "contrary to, or involved an unreasonable application of, clearly established Federal law."  *Lockyer*,

28   538 U.S. at 72, (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas

court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Lockyer*, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *See Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).  Furthermore, AEDPA requires that we give considerable deference to state court decisions.  The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1).  A federal habeas court is bound by a state's interpretation of its own laws. *Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002).

The initial step in applying AEDPA's standards requires a federal habeas court to "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more than one State court has adjudicated Petitioner's claims, the Court analyzes the last reasoned decision. *Id*. (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) for the presumption that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same ground as the prior order).  Thus, a federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision in order to determine whether that decision was contrary to or an unreasonable application of clearly established federal law. *Bailey v.*

1   *Rae*, 339 F.3d 1107, 1112-1113 (9th Cir. 2003).  Here, the California Court of Appeal and the

2   California Supreme Court were the only courts to have adjudicated Petitioner's claims.  As the

3   California Supreme Court summarily denied Petitioner's claims, the Court looks through those

4   decisions to the last reasoned decision; namely, that of the California Court of Appeal.  *See Ylst v.*

5   *Nunnemaker*, 501 U.S. at 804.

6   **III.      Review of Petitioner's Claims**

7          The petition for writ of habeas corpus contains six grounds for relief, all contending that

8   Petitioner's constitutional rights were violated by: (1) conflict of interest as his trial counsel had

9   previously represented a witness; (2) trial court's denial of Petitioner's motion to sever his trial from

10  that of co-defendant; (3) trial court's refusal to strike witness testimony after the witness invoked the

11  Fifth Amendment privilege against self-incrimination; (4) trial court's issuance of California Jury

12  Instruction Criminal (CALJIC) No. 3.16 was a structural error as it directed a verdict of guilty; and

13  (5) issuance of CALJIC No. 2.11.5 was erroneous.

14         1.      **Ground One: Conflict of Interest**

15         Petitioner's trial counsel unsuccessfully sought a motion to be relieved by the court as

16  Petitioner's counsel due to a conflict of interest as counsel's office has previously represented a

17  witness, John Brown, in unrelated proceedings.  Petitioner contends that the trial court's denial of

18  counsel's motion violated his Sixth Amendment right to counsel.

19         The relevant trial court proceedings, as summarized by the State appellate court, were as

20  follows :

21             After the incident involving the Browns and Santana came to light, counsel for
       Garcia disclosed that he (not personally but as a member of the public defender's
22     office) also represented John Brown, who was now a potential witness against
       Santana. Counsel for Santana disclosed that he represented Felipe Ruiz, who was a
23     cellmate of Santana and Brown when the pertinent events took place.

24             The People sought to call John and Sylvia Brown as witnesses. The district
       attorney had reached an agreement with Sylvia regarding her proposed testimony. It
25     was agreed that she would plead guilty to conspiracy to commit perjury in exchange
       for a low term sentence that would be suspended. She would receive jail time. The
26     proposed sentence was in exchange for her truthful testimony at this trial.

27             Recognizing the dilemma, the court asked counsel for Santana and Garcia to
       consult the State Bar ethics hotline for guidance on the question of the potential
28     conflicts. Santana's counsel stated that he had not gone to talk to Ruiz because of the

issue now before the court. The court ordered that no one was allowed to talk to Ruiz at this point in time: this ruling applied to defense counsel, the prosecution, and law enforcement. The People indicated that they had no intention of calling Ruiz as a witness. The district attorney said he would not bring up Ruiz. To this, Santana's counsel stated he could not properly represent Santana without questioning Ruiz, but he could not question Ruiz because he represents him and Santana. Santana repeated this argument throughout the numerous discussions of this issue.

It was argued by the prosecution that if no information had been transmitted to Garcia's attorney from John Brown that would impinge on the attorney's representation of Garcia, then there should not be a problem. The court stated that it did not have a sufficiently convincing offer of proof that John was a necessary witness and was prepared to admit the testimony of Sylvia. Counsel for Garcia argued that if Sylvia were allowed to testify, then Garcia's counsel would want to subpoena John and at that point he (Garcia's counsel) would have to withdraw from representing Garcia in this case.

The court ruled that Sylvia's testimony was admissible with an instruction limiting its use as against Santana only. Counsel for Santana and Garcia said they were going to have to subpoena John as a defense witness. The court responded that it would appoint counsel to represent John and would also appoint independent counsel for Ruiz.

Sylvia was called to testify outside the jury's presence. After she testified, the court said it was going to admit Sylvia's testimony and portions of the tape-recorded jailhouse telephone conversation. Sylvia testified in front of the jury.

John testified outside the presence of the jury and stated that he was going to exercise his right to remain silent. He was called in front of the jury and exercised his right to remain silent. The trial court then denied the motion of Garcia's counsel to be relieved, finding that there was no conflict that necessitated relief.

(Lod. Doc. 9 at 51-52.)

Pursuant to the Sixth Amendment of the United States Constitution, criminal defendants have the right to effective assistance of counsel, which includes the right to counsel free of conflicting interests. *Lewis v. Mayle*, 391 F.3d 989, 997 (9th Cir. 2004) (citing to *Wood v. Georgia*, 450 U.S. 261, 271 (1981) in stating "[t]he Sixth Amendment ensures that a criminal defendant has the right to representation that is free from conflicts of interest and the assistance of counsel whose loyalties are not divided"); *see United States v. Mett*, 65 F.3d 1531, 1534 (9th Cir. 1995). Consequently, the Ninth Circuit has found that where a criminal defendant moves to relieve trial counsel based on a conflict of interest, " it is well established and clear that the Sixth Amendment required on the record an appropriate inquiry into grounds for such a motion, and that the matter be resolved on the merits before the case goes forward." *Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (finding trial court's failure to rule on motion to substitute counsel based on conflict of interest was erroneous and

that evidentiary hearing was required to determine the extent to which counsel and petitioner's

relationship had deteriorated).  Here, there is no allegation that the trial court's failed to conduct an

appropriate inquiry into the conflict of interest; rather, Petitioner alleges that the trial court's denial

of the motion to relieve counsel was erroneous.

The California Court of Appeal rejected this argument, finding that Petitioner had failed to

show that counsel's performance had been adversely affected by the asserted conflict under the

federal standard.  (Lod. Doc. 9 at 55).  The appellate court also noted that Petitioner could not

succeed under the more favorable California standard as the record did not support an *informed*

*speculation* that counsel's performance had been adversely affected by the asserted conflict of

interest.  The appellate court stated:

> Although Garcia's counsel repeatedly stated that severance was required
> because he also represented John and this caused a conflict of interest, at no time did
> Garcia's counsel ever suggest that he was in possession of any information from John
> that would be relevant to Garcia's defense that he could not disclose because of his
> representation of John. That Garcia's counsel did not possess such information is
> supported by the record. There is nothing in the record showing that Garcia's counsel
> was aware that Santana's cellmate, John, was involved in a scheme with Santana to
> present untruthful testimony via Sylvia. There is nothing in the record to even suggest
> that Garcia's counsel was aware that a cellmate of Santana was represented by him or
> his office. Thus, the chance that Garcia's counsel would have information about the
> scheme from John was not shown or even inferable from the record....
>      [C]ounsel here made no good faith showing whatsoever that he was in
> possession of confidential information from John that created a conflict. Furthermore,
> we do not find anything in the record to support a finding that counsel for Garcia
> "pulled his punches" and failed to represent Garcia as vigorously as he might have in
> the absence of the asserted conflict. We do not see how Garcia's counsel's failure to
> object to John's exercising his right to refuse to testify in front of the jury
> demonstrated a conflict or adversely affected counsel's performance in representing
> Garcia. If Garcia's counsel thought the decision to call John before the jury to invoke
> his right to remain silent was so critical to John personally, counsel could have
> informed the court of the dilemma he now raises for the first time on appeal without
> divulging any confidences and without harming either Garcia or John.

(Id. at 55-56).

As the California Court of Appeal correctly noted under the federal standard Petitioner is

required to "demonstrate that an actual conflict of interest adversely affected his lawyer's

performance" in order to obtain habeas corpus relief. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980);

*Mett*, 65 F.3d at 1534; *Mickens*, 535 U.S. 162, 172 n.5 (2002) ("An 'actual conflict' for Sixth

Amendment purposes, is a conflict of interest that adversely affects counsel's performance").  While

claims predicated on the deprivation of a defendant's Sixth Amendment rights generally require a showing of both deficient performance and prejudice, *Strickland v. Washington*, 466 U.S. 668, 687(1984), a defendant need not show prejudice for a claim predicated on counsel's conflict of interest, *Cuyler*, 446 U.S. at 349-350.  The Supreme Court noted in *Cuyler* that "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 349-350 (citations omitted); *see also Sanders*, 21 F.3d at 1452 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978) in stating that "[o]nce an actual conflict has been demonstrated, prejudice is presumed since the harm may not consist solely of what counsel does, but of 'what the advocate finds himself compelled to *refrain* from doing, not only at trial but also' during pretrial proceedings and preparation") (emphasis in original).  In *Lewis v. Mayle*, 391 F.3d at 997-998, the Ninth Circuit found a conflict of interest as the attorney's previous representation of a witness adversely affected the defense presented at trial.  The *Lewis* court found significant the fact that trial counsel refrained from eliciting evidence on at least three points, including an instance in which counsel failed to present evidence discrediting the witness with information obtained from the attorney's previous representation of the witness.

Here, Petitioner alleges in a conclusory fashion that trial counsel possessed confidential information obtained form his office's previous representation of Brown that would have been advantageous to his defense.  As noted by the appellate court, the record contradicts such an assertion as there is no indication that trial counsel in fact possessed any information obtained from his office's representation of Brown that was pertinent to Petitioner's defense.  More importantly, Petitioner does not advance the argument that counsel's representation was adversely affected by his conflict of interest other than to argue that counsel's cross examination of Sylvia Brown was directed at attacking only her credibility.  (Traverse at 5.)  However, Petitioner does not address what other information trial counsel should have elicited during cross examination.  As the Court finds such an allegation insufficient support for Petitioner's claim that counsel's representation was adversely affected by the alleged conflict of interest, the Court does not find the California Court of Appeal's rejection of this claim to be an objectively unreasonable application of *Cuyler*.    Alternatively,

1   Petitioner advances the argument that adverse affects are not required as there was a *per se* conflict

2   of interest.  In support of this proposition, Petitioner cites to *United States v. Fulton*, 5 F.3d 605 (2d

3   Cir. 1993) and *United States v. Schwarz*, 283 F.3d 76, 95 (2d Cir. 2002).  The Court finds

4   Petitioner's argument unpersuasive as neither case supports Petitioner's proposition that there is a

5   *per se* conflict of interest in his case.  The Court initially notes that neither case is binding authority

6   on this Court.  In *Schwarz*, counsel represented a police officer accused of police brutality while his

7   firm had been retained for $10 million dollars to represent a police officer's association that was a

8   defendant in a civil suit pertaining to the same incident.  Thus, contrary to Petitioner's assertion, the

9   Second Circuit in *Schwarz* did find that counsel's representation was adversely affected by the

10  conflict of interest.  The *Schwarz* court found that this conflict of interest could not be waived as

11  counsel's ethical obligation to his client and counsel's own self interest in the retainer for other client

12  was so severe that no rational defendant would have knowingly and intelligently desired counsel's

13  representation.  Petitioner mistakes the Second Circuit's finding that the conflict was not subject to

14  waiver with the premise that the there is a *per se* conflict without the requisite showing of adverse

15  affect.

16      In *Fulton*, the Second Circuit held that a conflict of interest exists *per se* where defense

17  counsel was implicated in criminal activity that was the very crime for which defendant was being

18  tried.  The Second Circuit's rationale for this *per se* conflict rested on the conflicting interest that any

19  counsel in such circumstances would possess in not pursuing a vigorous defense as such a defense

20  might uncover evidence inculpating counsel.  Thus, as recognized by the Second Circuit the rulings

21  in both *Schwarz* and *Fulton* are limited to the facts of those cases and apply to only a "very narrow

22  category of cases."  *United States v. Perez*, 325 F.3d 115, 126-127 (2d Cir. 2003).  Here, there is no

23  argument that trial counsel possessed the type of severe conflict of interest that existed in either

24  *Schwarz* or *Fulton* that would necessitate a finding of a *per se* conflict of interest and thus the Court

25  rejects Petitioner's argument that this is a *per se* conflict of interest.

26      As Petitioner has not demonstrated that counsel's representation was adversely affected by

27  the alleged conflict of interest and the alleged conflict is not a *per se* conflict of interest, the Court

28  finds that Petitioner is not entitled to habeas corpus relief on this ground.

**2**.      **Ground Two: Severance**

Respondent contends that Petitioner failed to exhaust this claim as Petitioner, himself, did not raise this claim to the California Supreme Court in his petition for review.  As a federal habeas court may deny a petition on the merits despite Petitioner's failure to exhaust, the Court may bypass the exhaustion issue and proceed directly to the merits of Petitioner's claim.[9]  *See* 28 U.S.C. § 2254(b)(2); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002).

A court may grant habeas relief based on the state court's denial of a motion for severance only if the joint trial was so prejudicial that it denied the petitioner his right to a fair trial.  *Zafiro v. United States*, 506 U.S. 534, 538-539 (1993) (court must decide if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"); *United States v. Lane*, 474 U.S. 438, 446 n. 8 (1986) ("misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial"); *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir.1991) (same).  To successfully state a habeas claim based on a trial court's refusal to sever the petitioner's trial from his co-defendant, a petitioner "bears the burden of demonstrating that the state court's denial of his severance motion rendered his trial fundamentally unfair," *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997), and must establish that prejudice arising from the failure to sever was so "clear, manifest, and undue" that he was denied a fair trial. *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir.1999) (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1071-72 (9th Cir.1996)).   A trial is rendered fundamentally unfair "if the

---

[9]This issue was raised by Petitioner's co-defendant, Santana, in his petition for review.  The petitions for review by Petitioner, Santana, and Mendoza were consolidated into one case (Case No. S1518178) before the California Supreme Court, which issued a decision denying the petitions for review.  "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that...the applicant has exhausted the remedies available in the courts of the State."  See 28 U.S.C. § 2254(b)(1)(A).  A petitioner can satisfy exhaustion by fairly and fully presenting each federal claim to the state's highest court. *See Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996); *see also Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005).  "A petitioner fairly and fully presents a claim to the state court for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim."  *Insyxiengmay*, 403 F.3d at 668 (citation omitted).  Here, the appeals of all three criminal defendants were consolidated into one case before both the California Supreme Court and the California Court of Appeal (Case No. F046760) and both State courts issued one reasoned decision for the consolidated case.  The Court thinks it would be redundant to require that Petitioner has raised the claims contained in his co-defendant's petition for review in order to exhaust in light of these circumstances as there is no reasonable argument that the State courts were not fairly and fully apprised of the claims.

1 impermissible joinder had a substantial and injurious effect or influence in determining the jury's

2 verdict." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

3       On habeas review, federal courts neither depend "on the state law governing severance in

4 state trials" nor "consider procedural rights afforded in federal trials." *Grisby*, 130 F.3d at 370

5 (citing *Hollins v. Dep't of Corrections, State of Iowa*, 969 F.2d 606, 608 (8th Cir. 1992)). Instead,

6 the relevant question is whether the State court's decision not to sever the trial violated Petitioner's

7 due process rights. *Id.*; *see Featherstone*, 948 F.2d at 1503 ("simultaneous trial of more than one

8 offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due

9 process before relief pursuant to 28 U.S.C. § 2254 would be appropriate") (internal quotation marks

10 and citation omitted).

11       There is a preference for joint trials of defendants who are indicted together, unless mutually

12 antagonistic or irreconcilable defenses may be so prejudicial as to mandate severance. *See Zafiro*,

13 506 U.S. at 538. Severance should be granted only if there is a "serious risk that a joint trial would

14 compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable

15 judgment about guilt or innocence." *Id.* at 539. Here, there is no allegation that Santana, or

16 Mendoza had mutually antagonistic defenses that were irreconcilable with the core of Petitioner's

17 own defense such that "acceptance of the co defendant's theory by the jury precludes acquittal of the

18 defendant."[10] *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996); *see also Cooper v.*

19 *McGrath*, 314 F.Supp.2d 967, 983 (N.D. Cal. 2004). Rather, Petitioner's contention that the motion

20 for severance should have been granted is based upon alleged prejudice stemming from Sylvia

21 Brown's testimony that Santana bribed her to commit perjury. Here, the California Court of Appeal

22 found that no prejudice resulted from a failure to sever the trial as the trial court had clearly

23 instructed the jury that it could not use the evidence of Santana's dealings with Brown against either

24 Mendoza or Petitioner. (Lod. Doc. 9 at 51.) The appellate court noted that the contents of Sylvia

25 Brown's testimony's was not so prejudicial that the jurors ignored the trial court's admonitions.

26 ───────────────

27     [10]The Ninth Circuit in *Collins v. Runnels*,__F.3d___, 2010 WL 1780870, * 5 (9th Cir. 2010) recently clarified that for AEDPA purposes, "neither *Zafiro v. United States* nor *United States v. Lane* establish a constitutional standard binding

28 on the states requiring severance in cases where defendants present mutually antagonistic defenses." Thus, even if the defenses were antagonistic, Petitioner would not be entitled to habeas corpus relief.

1    Petitioner argues that the prosecutor's statements regarding Santana's bribery and subordination or

2    perjury charges conveyed the image that all three defendants "hatched this plan."  (Pet. at 5(b)).  The

3    prosecutors actual statement was:

4          Ladies and gentlemen, this is a detailed tapestry of direct evidence, circumstantial
           evidence, and just plain old common sense as to what happened.  It weaves a clear
5          and unmistakable image and that is that these three hatched this plan with Pelon.
           They carried it out, they murdered and then sought to cover it up through threats,
6          intimidation and *in the case of Henry Santana, bribery and perjury*.

7    (RT at 2713) (emphasis added).  Petitioner's contention that this statement invited the jury to use

8    evidence relating to the bribery of Sylvia Brown against Petitioner and Mendoza must fail.  While

9    the prosecutor alludes to the participation of all three defendants in the plan with Pelon, the

10   prosecutor's statements make clear that the bribery and perjury evidence pertained only to Santana.

11        Additionally, the Court agrees with the State appellate court that any prejudice that might

12   have resulted from the introduction of this evidence was dissipated by the trial court's instruction to

13   the jury that they could only consider the testimony of Sylvia Brown against Santana.  In fact the trial

14   court emphasized this, admonishing the jury that "[t]here's going to be testimony here from Ms.

15   Brown and accompanied by a recording which, as you already know, will be played in court and you

16   will be provided transcripts.  *This testimony is limited, to be considered against Mr. Santa only.  Mr.*

17   *Santana.  Not to be considered against Mr. Garcia or Mr. Mendoza*."  (RT at 2254) (emphasis

18   added).  Additionally, in the instructions the court issued prior to closing argument, the jury was

19   reminded "[e]vidence has been omitted against one of more of the defendants, and not admitted

20   against the others.  ¶  At the time this evidence was admitted you were instructed that it could not be

21   considered by you against the other defendants.   ¶ Do not consider this evidence against the other

22   defendants."  (RT at 2654.)  As the presumption exists that jurors followed the trial court's

23   instruction, *see Fields v. Brown*, 503 F.3d 755, 781 (9th Cir. 2007) (citing *Richardson v. Marsh*, 481

24   U.S. 200, 206,(1987)), the Court must presume that the jurors did not consider the evidence relating

25   to the bribery and perjury of Sylvia Brown against anyone other than Santana.  As noted by the

26   California Court of Appeal, Petitioner's ability to make a showing that he was prejudiced by the

27   denial of the severance motion is also hampered by the abundance of independent evidence

28   establishing Petitioner's and Mendoza's guilt which had been admitted prior to Sylvia Brown's

testimony.  (Lod. Doc. 9 at 50.)  Thus, the Court finds that the California Court of Appeal's decision was reasonable as the abundance of independent evidence and the trial court's instructions weigh heavily against a finding that the denial of the severance motion had "a substantial and injurious effect or influence in determining the jury's verdict." *Sandoval*, 241 F.3d at 772.  Therefore, Petitioner is not entitled to habeas corpus relief on this ground.

### 3.   Ground Three: Refusal to Strike Witness Testimony

Petitioner contends that his Confrontation Clause rights were violated when the trial court refused to strike the testimony of Isais Fierros.  The state court summarized the facts as they pertain to this ground for relief, stating:

> On cross-examination, Fierros began to change his story. He said that Mendoza wanted the money for Pelon's bail. He testified that he made up stories for the police because he was concerned about his child and he wanted to get Garcia and Mendoza off the street. When he first called the police to tell them that someone had tried to take his child, the officer told him he was not a babysitter and he should make his report in person. Fierros was angry enough with Garcia to tell lies about him and to kill him. Fierros wanted Garcia arrested and off the streets. Fierros told police that Mendoza's car might be found in Oakland, but Fierros did not drive the car there. Fierros testified that Garcia did not confess a murder to him, but perhaps he gave that impression to the police because he needed the police to get Garcia locked up. Fierros testified that Mendoza never asked him for money because of a murder. Fierros was mad at Mendoza and wanted him off the streets. Fierros said he was telling the truth now in court.

> On redirect examination, Fierros starting repeating the version of events he told on cross-examination. He testified that Mendoza did call him and ask him for money but Mendoza did not say he was going to kill Fierros nor did Mendoza tell Fierros he killed a man in Merced. Fierros made up a lot of things he told police with the purpose of getting Mendoza and Garcia off the streets.

> At this point in the proceeding, and in front of the jury, the prosecutor asked to question Fierros with leading questions because he was now a hostile witness. Counsel for Garcia stated that perhaps counsel should be appointed for Fierros. The prosecutor responded that he thought counsel should be appointed, "because this is getting into perjury territory." The district attorney mentioned perjury again.

> A recess was taken until the next morning. The court memorialized that a discussion had occurred in chambers and at this point in time it was the court's understanding that Fierros did not wish to answer any more questions on Fifth Amendment grounds. The court questioned Fierros and he said he did not wish to answer any more questions on Fifth Amendment grounds, "otherwise I would get in trouble." The court told the jury that Fierros has exercised his Fifth Amendment right and was not going to testify anymore.

> Shortly thereafter the following occurred:

> "MR. PRO: [Counsel for Garcia] While we're on the record also, we had

1    talked in chambers a little bit, but I would like to put on the record my
     objection to the request to have the entire testimony stricken because he is
2    refusing to testify further.

3    "THE COURT: I could take that under advisement, Mr. Pro. I'm looking for
     some authority there.
4
     "MR. PRO: I understand that.
5
     "THE COURT: I assume that at the time you're able to research that you'll
6    present that to me and the court can make a ruling.

7    "MR. PRO: I just wanted to make sure that I got that on the record."

8    Officer McKnight was called to testify regarding Fierros's report to him at the
     police station. His testimony was for impeachment to show inconsistent statements of
9    Fierros at trial and in the report.

10   (Lod. Doc. 9 at 40-41.)

11   Petitioner contends the trial court violated his Confrontation Clause rights by failing to strike

12   Fierros' entire testimony and by permitting Officer McKnight to testify to Fierros' prior statements

13   as Petitioner was not afforded a full cross examination of Fierros.  The Confrontation Clause protects

14   a defendant from unreliable hearsay evidence being presented against him during trial.  *See* U.S.

15   Constitution, Amendment VI.  The Confrontation Clause of the Sixth Amendment specifically

16   provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted

17   with the witnesses against him."  *Id*.  The Sixth Amendment's Confrontation Clause was made

18   applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *Melendez-*

19   *Diaz v. Massachusetts*, 129 S.Ct. 2527, 2531 (2009) (citing *Pointer v. Texas*, 380 U.S. 400, 403

20   (1965)).   In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that

21   the Confrontation Clause bars the state from introducing out-of-court statements which are

22   testimonial in nature, unless "the declarant is unavailable, and only where the defendant has had a

23   prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59.   "The main and essential purpose of

24   confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*,

25   415 U.S. 308, 315-316 (1974).  However, while the Confrontation Clause of the Sixth Amendment

26   "'guarantees an opportunity for effective cross-examination,' this does not mean 'cross-examination

27   that is effective in whatever way, and to whatever extent, the defense might wish.'"  *Delaware v.*

28   *Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per

1   curiam)).

2       Here, Petitioner does not allege that he was entirely deprived of the opportunity to cross

3   examine Fierros; rather, Petitioner argues he did not receive a full opportunity to cross examine

4   Fierros.  The California Court of Appeal rejected this claim, finding that all three defendant were

5   given a full opportunity to cross examine the witness.[11]  The appellate court noted that it was actually

6   the prosecution's re-direct examination that had been cut short due to Fierros' invocation of the Fifth

7   Amendment.  While Respondent is correct that the right to be confronted with witnesses against him

8   encompasses the right to effective cross examination, the Court does not find that Petitioner was

9   deprived of this right in the instant case.  *See United States v. Ganoe*, 538 F. 1117, 1125 (9th Cir.

10  2008) (quoting *United States v. Larson*, 495 F.3d 1094, 1101-02 (9th Cir. 2007) (en banc)).  The

11  Ninth Circuit has explicitly identified three factors to consider in determining whether a defendant's

12  right to effective cross-examination was violated: "(1) whether the excluded evidence was relevant;

13  (2) whether there were other legitimate interests outweighing the defendant's interest in presenting

14  the evidence; and (3) whether the exclusion of evidence left the jury with sufficient information to

15  assess the credibility of the witness."  *Larson*, 495 F.3d at 1103.  Here, Petitioner does not allege any

16  relevant evidence was excluded from his inability to further cross examine Fierros.  Additionally, the

17  legitimate interest outweighing Petitioner's continued questioning of Fierros was Fierros invocation

18  of his Fifth Amendment right, which was clearly warranted in this circumstance as Fierros presented

19  two conflicting stories on direct and cross examination thus subjecting himself to possible

20  prosecution for perjury.  Lastly, the Court finds that the direct and cross examination of Fierros

21  provided the jury with sufficient information to assess the credibility of the witness as the jury

22  witnessed first hand Fierros confess about lying to incriminate the defendants and his motivations for

23  doing so.  This is not a case where Petitioner had no opportunity to confront the witness about why

24  the witness' prior statements.  *See United States v. Wilmore*, 381 F.3d 868, 872 (finding violation of

25  Confrontation Clause where trial court limited cross examination to topics other than witness' grand

26  _____

27      [11] The appellate court's discussion of the issue on the merits is limited, as the decision mainly addresses Petitioner's failure to preserve this claim on appeal and thus the state procedural rule that barred relief.  (Lod. Doc. 9 at 41-42).  As Respondent does not raise the affirmative defense of procedural default, the Court limits its discussion of this issue to the

28  merits of the claim.

1   jury testimony, which contradicted her testimony in court).  In contrast, Petitioner's counsel had a

2   thorough opportunity to cross examine Fierros, (RT at 1426-1450), during which Fierros recanted his

3   previous statements and admitted his bias for previously incriminating Petitioner.  Therefore, the

4   Court finds that the California Court of Appeal's decision was not an objectively unreasonable

5   application of *Crawford*.

6          Moreover, even if it was constitutional error for the trial court to refuse to strike Fierros'

7   testimony, the alleged error did not have a "substantial and injurious effect or influence in

8   determining the jury's verdict" and was therefore harmless as Fierros recanted his allegations that

9   Petitioner was involved in the murder.  *See Brecht*, 507 U.S. at 637-38; *see also Fry v. Pliler*, 551

10  U.S. 112, 121-22, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (federal court on state habeas review

11  should apply Brecht harmless error standard even if state court did not recognize the error or conduct

12  a harmless error analysis).

13         **4.      Ground Four: Issuance of CALJIC No. 3.16**

14         Petitioner contends that it was erroneous for the trial court to have issued CALJIC No. 3.16

15  as the instruction directed a guilty verdict against Petitioner and denied him his right to have a jury

16  finding on guilt beyond a reasonable doubt.

17         Generally, claims based on instructional error under state law are not cognizable on habeas

18  corpus review.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459

19  U.S. 422, 438 n. 6 (1983)).   To obtain federal collateral relief for errors in the jury charge, a

20  petitioner must show that the error so infected the entire trial that the resulting conviction violates

21  due process.  *Estelle*, 502 U.S. at 72; *see Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting

22  *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) in finding that a habeas court must not merely

23  consider whether an "instruction is undesirable, erroneous, or even universally condemned" but must

24  instead determine"'whether the ailing instruction by itself so infected the entire trial that the resulting

25  conviction violates due process'"); *see also Waddington v. Sarausad*, 129 S.Ct. 823, 832 (2009)

26  (noting that the pertinent question is whether the ailing instruction by itself so infected the entire trial

27  that the resulting conviction violates due process").  An erroneous jury instruction "directed toward

28  an element of the offense may rise to the level of a constitutional defect." *Byrd v. Lewis*, 566 F.3d

855, 862 (9th Cir. 2009) (citing *Neder v. United States*, 527 U.S. 1, 9-10 (1999)).  "Due process

requires that jury instructions in criminal trials give effect to the prosecutor's burden of proving

every element of the crime charged beyond a reasonable doubt. [Citation] 'Nonetheless, not every

ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process

violation.'" *Townsend v. Knowles*, 562 F.3d 1200, 1209 (9th Cir. 2009) (quoting *Middleton v.*

*McNeil*, 541 U.S. 433, 437 (2004) (per curiam)).   Additionally, "[t]he jury instruction may not be

judged in artificial isolation, but must be considered in the context of the instructions as a whole and

the trial record."  *Id*. (citation and internal quotation marks omitted).  "If the charge as a whole is

ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the

challenged instruction in a way that violates the Constitution." *Middleton*, 541 U.S. at 437.

The California Court of Appeal rejected Petitioner's claim, finding that the jury instruction

was neither erroneous nor did it direct a guilty verdict against Petitioner.  (Lod. Doc. 9 at 59).

Examining the jury charge as a whole, the Court finds that the appellate court's determination was

objectively unreasonable.  While the trial court instructed the jury on the definition pertaining to

principals and accomplices, the court then instructed the jury that, "[i]f the crimes alleged herein

were committed by anyone, Francisco Garcia was an accomplice as a merit [sic] matter of law and

his statement is subject to the rule requiring corroboration."[12]  (Id. at 2667).  The appellate court

found that Petitioner met the definition of an accomplice as a matter of law and that in light of the

instruction defining an accomplice, there was no "reasonable likelihood that jurors might have

interpreted the instruction in question as directing a verdict against Garcia in whole or in part."

(Lod. Doc. 9 at 59.)  The appellate court's conclusion that the jury could not have interpreted the

instruction as directing a verdict against Garcia is objectively unreasonable in light of the plain

language of the instruction.  The appellate court's reasoning that Petitioner satisfied the definition of

an accomplice as a matter of law is likewise unavailing.  It may be true that Petitioner meets the

definition of an accomplice, defined as including someone who is "subject to prosecution for the

---

[12] The trial court's instructions attempted to convey the fact that Petitioner's statements, as attested to by Torres, qualified as accomplice testimony requiring independent corroboration in order to evidence a defendant's guilt. (RT at 2665-2666.)

1   identical offense charges against the defendant on trial by reason of aiding and abetting or being a

2   member of a criminal conspiracy." (RT at 2665.)  However, the appellate court's decision ignores the

3   fundamental fact that such a finding is the province of the jury, not the trial judge or the appellate

4   court.  In instructing the jury that Petitioner was an accomplice as a matter of law, the trial court

5   permitted the jury to find Petitioner guilty based on a theory of accomplice liability without having to

6   find that Petitioner had committed any of the requisite elements of being an accomplice.  Such an

7   error so infects the entire trial that the resulting conviction violates due process as it pertains to an

8   element of the crime.[13]

9          The Court finds, however, that in Petitioner's circumstance, this error is harmless.[14]  As noted

10  by the United States Supreme Court in *Neder v. United States*, 527 U.S. 1, 9 (1999), a jury

11  instruction that omits an element of the offense is subject to harmless error review as an "instruction

12  that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair

13  or an unreliable vehicle for determining guilt or innocence."  The jury instruction here is

14  distinguished from a constitutionally deficient reasonable doubt instruction as a deficient reasonable

15  doubt instructions means the jury reached no verdict at all.  *See United States v. Recio*, 371 F.3d

16  1093, 1101-1102 (9th Cir. 2004) (distinguishing error in *Sullivan v. Louisiana*, 508 U.S. 275, 282

17  (1993) from the error in *Neder*).  Contrary to Petitioner's assertion, the instruction here is not similar

18  to the instruction in *Sullivan*, which concerned a defective reasonable doubt instruction that vitiated

19  the whole verdict.  (Traverse at 21-22.)  Rather, the instruction here is more akin to a mandatory

20  presumption instruction as the jury would still have had to find that Petitioner's co-defendants

21  committed the crimes beyond a reasonable doubt.  *See Powell v. Galaza*, 328 F.3d 558, 566 (9th Cir.

22  2003) (citing *Carella v. California*, 491 U.S. 263, 266 (1989) for proposition that mandatory

23  presumption instruction may be reviewed under harmless error analysis as the jury is still required to

24  _____

25      [13] As noted by Respondent, this instruction does not directly instruct the jury that they must find Petitioner guilty.
    Rather, the instruction predicates Petitioner's guilt on a finding by the jury that one of his co-defendants committed the crime
26  as a principal.  However, this does not cure the erroneous instruction as the instruction would still permit a jury relying on
    an accomplice liability theory to convicted Petitioner upon a finding that a co-defendant was a principal and committed the
27  murder without ever finding that Petitioner himself participated in any criminal conduct.

28      [14] Presuming that the District Court adopts this findings, the Court would recommend issuance of a certificate of
    appealability on this issue.

find the predicate facts beyond a reasonable doubt).  More importantly, the Supreme Court made clear in *Fry v. Pliler*, 551 U.S. 112, 119-120 (2007), that a federal habeas court must assess the prejudicial impact of a constitutional error under the more forgiving standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).  The *Brecht* standard requires the court to ascertain whether the error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Fry*, 551 U.S. at 121-122.  The *Brecht* standard applies to the error regardless of whether the California Court of Appeal engaged in a *Chapman v. California*, 386 U.S. 18 (1967) harmless error analysis.  *See id*.

Here, the Court finds the error harmless.  The record reveals that there was an abundance of evidence that Petitioner was at the very least an accomplice to the crime.  Petitioner's fingerprints were found inside the rear passenger window of a car (RT at 1642-1643), that also contained the victim's blood (RT at 497-498, 1666, 1677.)  David Medina identified Petitioner as one of the men who brought a hooded man to the house on the day of the murder and who then left with the man.  (RT at 862-863, 870.)   Ramon Medina also testified that Petitioner was one of the men who showed up at the Merced house with a bleeding man who they then took to the back room.  (RT at 948-951.)  Scott Rufer identified Petitioner as part of the group of men who brought a man with a hood over his head to his house. (RT at 712-713.)  This testimony was corroborated by Maria Bustos, who testified that Petitioner was holding onto the hooded man while armed with a big handgun and lead the hooded man into the house.  (RT at 1208-1209, 1215.)  Ms. Bustos also testified that Petitioner brought the hooded man out of the house and into a car after a period of time.  (RT at 1209, 1217.)  Sergio Torres testified that Petitioner confessed to kidnaping a man, taking him to the Merced house, and then transporting him to a canal outside of Merced where Petitioner and co-defendants shot him.  (RT at 1862-1865.)  Lastly, Petitioner attempted to evade police custody and struggled with the police when they went to arrest him for the crime.  (RT at 1585, 1590-1598.)  Additionally, as noted by Respondent, Mendoza's counsel remarked during closing argument that, "[t]his is all or nothing, either they were there or they weren't."  (RT at 2857-2858.)  In light of the fact that all the evidence presented against Mendoza also incriminated Petitioner, the jury's finding that Mendoza was guilty of the crime is probative as the jury obviously found such evidence credible and convincing beyond a

1    reasonable doubt.  In light of the jury's verdict and the abundance of testimony evidencing

2    Petitioner's involvement in the crime, the Court does not find that the instruction had a substantial

3    and injurious affect in determining the guilty verdict.  Consequently, Petitioner is not entitled to

4    habeas corpus relief on this ground.

5        **5.        Ground Five: Issuance of CALJIC No. 2.11.5**

6        In his last ground for relief, Petitioner challenges the issuance of CALJIC No. 2.11.5.  That

7    instruction, as given by the trial court, states:

8                There has been evidence in this case indicating that a person other than a
             defendant was or may have been involved in the crime for which that defendants are
9            on trial.
                 There may be many reasons why that person is not here on trial. Therefore, do
10           not speculate or guess as to why the other person is not being prosecuted in this trial
             or whether he has been or will be prosecuted. Your duty is to decide whether the
11           People have proved the guilt of each defendant on trial.

12   (RT at 2655.)

13       Petitioner contends that the instruction not to speculate at to why the other persons were not

14   on trial undercut the defense's theory that Ramon Medina or Fierros were the responsible parties,

15   thus violating his right to present a defense.[15]  (Traverse at 26.)  The California Court of Appeal

16   rejected Petitioner's first argument, finding that the instruction that the jury is not to speculate or

17   guess why the other person is not being prosecuted does not foreclose the jury from considering that

18   the unjoined perpetrator is the actual guilty party.  The Court does not find this to be an objectively

19   unreasonable application of clearly established federal law. The interpretation advanced by Petitioner

20   defies the plain meaning of the instruction which forbids only speculation of why the other person is

21   not being prosecution.  It does not forbid consideration of the other person as a perpetrator of the

22   crime.  This is especially true as the trial court further instructed the jury that they "must determine

23   whether Ramon Medina was an accomplice."  (RT at 2669.)  Thus, it is not reasonable to surmise

24

25       [15]Petitioner additionally posits that the instruction diluted the prosecutor's burden of proof.  (Traverse at 26).
     Petitioner does not explain how this instruction lessens the burden the prosecutor bears.  The Court notes that in this case,
26   the trial court explicitly instruct the jury that the prosecution bears the burden of proving beyond a reasonable doubt that
     Petitioner is the person who committed the charged crimes. (RT at 2663.)  Thus, the Court finds Petitioner's argument to
27   be a conclusory allegation that does not merit relief. *See Cox v. Del Papa*, 542 F.3d 669, 681 (9thCir. 2008) (quoting *James
     v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)("Conclusory allegations which are not supported by a statement of specific facts do
28   not warrant habeas relief")).

1   that the jury would have read CALJIC 2.11.5 to mean that Fierros and Median could not be the

2   responsible parties as that would have contradicted the later instruction given by the trial court.  As

3   for any argument that this instruction prohibited the jury from considering the motivation of Median

4   and Fierros in testifying against the defendants, such an argument cannot prevail as the trial court

5   also instructed the jury that they were to consider the existence of bias, interest, or motive in

6   assessing the credibility of a witness.  (RT at 2656.)  Thus, the Court finds that the Court of Appeal's

7   decision was not objectively unreasonable and that Petitioner cannot prevail on this claim.  *See Allen*

8   *v. Woodford*, 395 F.3d 979, 996 (9th Cir. 2005) (finding no reasonable likelihood that the jury

9   understood CALJIC No. 2.11.5 to bar consideration of the witness' motives for testifying in light of

10  instructions on witness bias and instruction that witness was an accomplice whose testimony should

11  be viewed with distrust).

12                                   **RECOMMENDATION**

13          Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

14  DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

15  Respondent.

16          This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United

17  States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of

18  the Local Rules of Practice for the United States District Court, Eastern District of California.

19  Within thirty (30) days after being served with a copy, any party may file written objections with the

20  court and serve a copy on all parties.  Such a document should be captioned "Objections to

21  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

22  filed within ten (10) *court* days (plus three days if served by mail) after service of the objections.

23  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The

24  parties are advised that failure to file objections within the specified time may waive the right to

25  appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

26

27  IT IS SO ORDERED.

28  **Dated:    May 14, 2010                          /s/ John M. Dixon**

UNITED STATES MAGISTRATE JUDGE