1

2

3

4

5           UNITED STATES DISTRICT COURT

6                EASTERN DISTRICT OF CALIFORNIA

7   FRANCISCO OROSCO GARCIA,        )   1:08-CV-01819 AWI JMD HC
                                    )
8              Petitioner,          )   FINDINGS AND RECOMMENDATION
                                    )   REGARDING PETITION FOR WRIT OF
9       v.                          )   HABEAS CORPUS
                                    )
10  WARDEN M.S. EVANS,              )
                                    )
11             Respondent.          )   OBJECTIONS DUE WITHIN THIRTY  (30)
    _____ )   DAYS

12

13        Francisco Orosco Garcia ("Petitioner") is a state prisoner proceeding *pro se* with a petition

14  for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

15                        **PROCEDURAL HISTORY**

16        Petitioner is currently in the custody of the California Department of Corrections and

17  Rehabilitation pursuant to a July 13, 2004, jury verdict finding Petitioner and his two co-defendants

18  (Salvador Mendoza and Henry Santana) guilty of the first degree murder of Roberto Ramirez (Cal.

19  Penal Code § 187).  (Answer at 1.)  The jury further convicted the three defendants on the

20  corresponding charges of torture (Cal. Penal Code § 206), conspiracy (Cal. Penal Code § 182), and

21  kidnaping (Cal. Penal Code § 207(a)).  (Answer at 1; Pet. at 1.)  The trial court sentenced Petitioner

22  to life without the possibility of parole.

23        Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District,

24  which issued a reasoned opinion on October 19, 2007, affirming Petitioner's conviction.  (*See* Lod.

25  Doc. 9.)[1]

26        Petitioner filed a petition for review with the California Supreme Court on November 20,

27  _____

28        [1]Petitioner also filed a petition for rehearing with the Court of Appeal. (Lod. Doc. 10; Answer at 2).  The appellate court denied the petition for rehearing on November 9, 2009.  (Lod. Doc. 11).

1   2007.  (Lod. Doc. 12; Answer at 2.)  The California Supreme Court denied the petition on January

2   30, 2008.  (Pet. at 3; Lod. Doc. 13.)[2]

3          On November 26, 2008, Petitioner filed the instant federal petition for writ of habeas corpus.

4          On May 18, 2009, Respondent filed an answer to the petition, to which Petitioner filed a

5   traverse on August 18, 2009.[3]

6                              **FACTUAL BACKGROUND**[4]

7          At approximately 6:30 p.m. on October 1, 2002, Isabel Valdes, a farm laborer
    living at a labor camp with about a dozen other people, observed a group of five men

8   enter the camp carrying a total of two handguns and a rifle. Those present in the camp
    were moved outside and ordered face down on the ground. They were told they would

9   be killed if they did not get down on the ground. The group asked for Roberto and
    Julian. Roberto Ramirez (the victim herein) said "here I am." Two men took the

10  victim away. During the encounter two other people were hit across the head with a
    handgun. The entire incident took about 10 minutes. Valdes could not describe the

11  men. Valdes testified that the men left in a four-door green vehicle. Valdes recognized
    exhibit 103 (a rifle seized from Eulalio Mendoza, a.k.a. Pelon) as looking like one of

12  the weapons he saw that evening. The people at the camp did not call the police
    because they were afraid.

13

14         Scott Rufer, an abuser of drugs, rented a house in Merced. His home was a
    place where various people would come to use drugs. David Medina (David) slept on

15  the couch in the house and his brother, Ramon Medina (Ramon), was an occasional
    overnight guest.

16         On October 1, 2002, at 8 or 9 p.m., David and Rufer were watching television
    in Rufer's house when a car pulled up in the driveway. David walked to the front door

17  when the car arrived. Rufer testified that five people got out of the car and one of
    them had a pillowcase over his head. The other four men escorted the victim to one of

18  the back bedrooms.

19         Rufer testified that, when the group entered his home, David spoke to them in
    Spanish and then told Rufer to sit on the couch, not to move, not to look, and not to

20  breathe. David was armed and unplugged all of the telephones. Ramon arrived after
    the group of men arrived. Ramon was armed with a shotgun or rifle.

21
           The group stayed in the back room approximately 20 to 25 minutes. The men
22

23         [2]Respondent admits that Grounds 1, 4, and 5 have been exhausted by Petitioner but contends that claims 2 and 3

24  are not "technically" exhausted.  (Answer at 2.)

25         [3]While Petitioner labels the document as a "denial and exception to the return to the order to show cause," it is clear
    that the document is Petitioner's reply to Respondent's answer. (Court Doc. 23).  Thus, the Court construes this document

26  to be Petitioner's traverse.

27         [4]These facts are derived from the California Court of Appeal's opinion issued on October 19, 2007.  (*See* Lod. Doc.
    9.)  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is

28  presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1);
    *see Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *Moses v. Payne*, 555 F.3d 742, 746 n. 1 (9th Cir. 2009).

came out of the back room occasionally during this time. David told Rufer that the victim was a snitch.

An old gray four-door car pulled up and the men left with the victim. Rufer and David remained at the house.

Rufer had no idea until months later of what happened to the victim. Rufer identified Eulalio Mendoza (a.k.a. Pelon[5]) as one of the four men who arrived with the victim. Pelon was a friend of the Medina brothers (David and Ramon). Rufer identified Garcia from a photo lineup on February 2003 as one of the men who was in the group that arrived with the victim. Rufer picked out Santana on the day he testified as one of the people in the group of men who accompanied the victim into Rufer's house. On cross-examination, Rufer said he saw Santana that evening but he was not positive if Santana was with the group. Rufer recognized Mendoza but was not sure if he was at his house with the group of men.

David was originally charged with murder. He entered a plea to false imprisonment and served six months in jail. He testified for the prosecution. David was living with Rufer in October of 2002. On October 1, 2002, he saw car lights. Three men walked into the house. One of the men had his head covered with a shirt or some other material. The other two men were armed. David did not know what was happening. David was told to stand by the door and not let anyone in the house. He did as he was told. The men went into the bedroom and remained there for 20 to 30 minutes. David's brother Ramon was there. The men came out of the room, a car pulled up, and the group got in the car and left. David did not know if Ramon ever went into the room where the men were with the victim. David recognized Garcia as one of the men who was with the victim. In addition, he testified that Pelon was the other man who accompanied the victim into the house.

Ramon was also charged with murder but pleaded guilty to false imprisonment and kidnapping. He received a jail term for his convictions. Ramon testified that he was staying at Rufer's house in October of 2002. Pelon was at the house earlier in the day on October 1, 2002, acting weird and nervous. Later in the day Pelon, Garcia, Mendoza, and Santana arrived at the house in a gray car (pictured in People's exhibit 15). They arrived with the victim. The victim was bleeding.

Ramon testified that the four men escorted the victim to the back room. They all had weapons, including a rifle and handguns. Santana and Mendoza left. Pelon came out and demanded that Ramon go in the back room. He complied. Ramon saw Pelon kicking the victim in the stomach, ribs, and back. Garcia pistol-whipped the victim on the forehead. Garcia asked the victim questions, including questions about "Queenie" and asked him where certain people were. Pelon and Garcia yelled at the victim. The victim was crying and hurting. He had tears and blood coming down his face. The victim asked them to quit.

Pelon went to the kitchen while Ramon and Garcia remained in the room with the victim. Ramon was sitting in a chair holding the rifle that Pelon handed to him. Ramon held the gun because Pelon demanded that he hold it.[6] Pelon had a handgun in his other hand. Pelon, Garcia, and the victim were in the back room between 45

---

[5] We will refer to Eulalio Mendoza as Pelon in order to distinguish him from defendant Mendoza.

[6] Ramon was shown a weapon at trial and asked if it was the weapon he was holding. He said yes. The record does not reflect the exhibit number of the weapon or the type of weapon that was shown to Ramon.

minutes to an hour. Ramon testified that he was only in the room for 25 minutes. The victim was curled up on the bed.

The same car that was used to bring the victim to the house was used to take the victim away. The victim was led out of the house with his face covered with a shirt. Ramon testified that the car belonged to Mendoza. Pelon told those remaining in the house to clean up. They did.

On cross-examination by Santana's attorney, Ramon was asked if he knew Sylvia Brown. He said he had "smoked dope" with her. He was asked if he had told Sylvia Brown that he had set up Santana. Ramon denied saying that to Sylvia Brown.

Maria Bustos (a.k.a. Lupe) lived in a room with her boyfriend at Rufer's home. On October 1, 2002, Rufer, Ramon, David, Pelon, and Bustos were present at the home. According to Bustos, Pelon seemed desperate, as if he was waiting for something. Four men arrived in a four-door car. The men pulled a person out of the car with his eyes covered by clothing. Pelon and Garcia took the victim into the house. The other two men remained outside and left. Garcia had a gun and was holding on to the victim. Ramon had a gun.

Bustos was told to go outside. She did. The men remained in the house for 30 to 60 minutes. The victim was then led outside by Garcia, David and Ramon. Pelon remained inside and called Bustos inside. Once inside Pelon told Bustos to clean up the blood. When the victim was brought inside he was wearing sandals and socks. When he left he was only wearing socks. Ramon kept the victim's sandals.

Merced Irrigation District employees were spraying the canal banks on October 4, 2002, when they saw something floating in the water. They determined that the object was a human body and called law enforcement.

Deputy Sheriff Gerald Dover arrived at the scene. The body was removed from the water. The arms of a shirt had been wrapped around the victim's neck and tied. Five expended shell casings were found on the canal bank. There were shoe impressions in the dirt.

Dr. James Wilkerson conducted an autopsy on the victim, Roberto Ramirez. A black Ramon was shown a weapon at trial and asked if it was the weapon he was holding. He said yes. The record does not reflect the exhibit number of the weapon or the type of weapon that was shown to Ramon. shirt was tied around the victim's neck. It appeared that the shirt had been worn as a hood. The victim had suffered six gunshot wounds. One wound began at the upper chest, another one to the chest, another to the lower chest, one through the arm, one to the left buttocks, and the final gunshot wound was to the upper left thigh. The wounds were excessive for the purpose of killing someone. The cause of death was multiple gunshot wounds.

In addition to the gunshot wounds, the victim had blunt force injuries to his face and groin. The victim had a laceration to the bridge of his nose and a cut above his left eye. He had bilateral injuries to his groin with the bruise on one side of the groin larger and more purple than the other side. These wounds were inflicted before the victim was shot. The bruises were large and characterized as severe. The doctor testified that it would take significant force to cause the bruising. It appeared from the size of the bruises that the victim was unaware that he was going to receive the blows to his groin. A groin injury is probably the most painful injury a man can receive. The victim suffered at least two blows to his groin.

The victim had alcohol and methamphetamine in his system when he died. Four expended bullets were removed from the victim during the autopsy.

On October 11, 2002 Oakland police officer Allen Miller found a car in an apartment building parking lot in a high crime area. The car was dusty and had been sitting there awhile. The car was returned to Merced County.

Mario Naranjo said he sold the car on May 9, 2002 to two people, Mendoza and his brother Fortino Mendoza. The payments were brought in each month. Sometimes the payments were made by defendant Mendoza, sometimes by Fortino.

The car was searched and checked for fingerprints. Blood was found in the car. Latent print analyst Richard Kinney processed the vehicle. He lifted 22 print cards. Mendoza's fingerprints were on a can of Red Bull found in the car and a container of Prestone interior cleaner. Garcia's prints were on the inside passenger rear window as well as on a cognac bottle. The fingerprint analyst was only asked to compare the prints of four people (Garcia, Mendoza, Santana, and Pelon) to the prints taken from the car and its contents.

Eight stains inside the car were tested for blood and were positive. Two of the stains were then tested for a DNA profile. The profile of the blood stains matched the victim's and would occur in one in 630 billion Hispanics. DNA on cigarette butts taken from the car matched Mendoza.

Isais Fierros knows the three defendants. Mendoza is Fierros's cousin, he is related to Santana, and he knows Garcia. On October 5, 2002 Fierros went to the Atwater Police Department to report a matter he had telephoned about on October 3 and 4. He told the police that Garcia had tried to take his child and that Mendoza had called him and demanded that he provide him with $50,000. Fierros told the police that Mendoza said he had killed someone in Merced and needed the money to get out of town. Fierros laughed when Mendoza said he was going to kill him. Fierros said that when Mendoza called him the next day and repeated the demand, he took him more seriously. Fierros did not go to the police until "they" attempted to take his child.

Fierros left the police department after making his report. Later that day, Fierros called 911 because Mendoza was following him and he was afraid. Mendoza was taken into custody. Officers found a loaded firearm under the passenger seat of the car he had been driving.

Fierros talked to Mendoza at the direction of the police department. When Fierros asked Mendoza what he had done in Merced, Mendoza replied, "That's nothing." Fierros told Detective Dover that Garcia mentioned that "they" had killed someone. Fierros agreed to wear a wire for the police and talk to Garcia. Fierros asked Garcia if the guns had been disposed of. Garcia said "they had thrown them away."

On cross-examination, Fierros began to change his story. He said that Mendoza wanted the money for Pelon's bail. He testified that he made up stories for the police because he was concerned about his child and he wanted to get Garcia and Mendoza off the street. When he first called the police to tell them that someone had tried to take his child, the officer told him he was not a babysitter and he should make his report in person. Fierros was angry enough with Garcia to tell lies about him and to kill him. Fierros wanted Garcia arrested and off the streets. Fierros told police that Mendoza's car might be found in Oakland, but Fierros did not drive the car there. Fierros testified that Garcia did not confess a murder to him, but perhaps he (Fierros)

gave that impression to the police because he needed the police to get Garcia locked up. Fierros testified that Mendoza never asked him for money because of a murder. Fierros was angry with Mendoza and wanted him off the streets. Fierros said he was telling the truth now in court.

On redirect examination, Fierros starting repeating the version of events he told on cross-examination. He testified that Mendoza did call him and ask him for money but Mendoza did not say he was going to kill Fierros nor did Mendoza tell Fierros he had killed a man in Merced. Fierros made up a lot of things he told police with the purpose of getting Mendoza and Garcia off the streets.[7]

Atwater police officer Aaron McKnight testified that he met Fierros in the lobby of the police station at 9:35 a.m. on October 5, 2002. Fierros had called the police department on October 3d, and October 4th. Fierros told Officer McKnight that Mendoza had called him and wanted $50,000 because he had killed a guy and he needed to flee. Fierros told McKnight that Mendoza said he would kill him if he did not come up with the money. Fierros was afraid of Mendoza and also afraid of Garcia because Garcia associated with Mendoza and Fierros thought Garcia was looking for him to do him harm.

Sergio Torres lived in Merced in October of 2002. He knew Garcia and Mendoza from Mexico and met Santana in the United States. Garcia called Torres before October 11, 2002, and asked him to come to his hotel and to bring beer and food. Torres went to the hotel room. Torres was accompanied by his girlfriend, and Garcia's girlfriend was also present. Torres and Garcia drank beer and consumed methamphetamine. When the women went to the store, Garcia told Torres that he, Mendoza, Santana, and Pelon had kidnapped a man, took the man to a house in Merced, and then took the man outside Merced to a canal bank. Mendoza made the victim sit on the canal bank. Garcia told Torres that Mendoza shot the man first and Garcia shot him after Mendoza shot him. Garcia was not sure if he hit the man with his shot. After the victim was shot he fell into the water. Garcia told Torres that they used Mendoza's car.

Garcia told Torres that when they were driving back from the canal they let Santana out of the car because he was scared and did not want to be with them anymore.

Torres testified that he has a methamphetamine problem and has been in trouble with the law. At the time he testified he had three cases pending. Torres's attorney went to law enforcement and said Torres had information he would provide in exchange for a better disposition. Torres talked to law enforcement about what Garcia told him with the hope that he would get help with his own legal problems. He reached an agreement with the prosecution. Charges pending against him were reduced and he was also given help to move away.

On cross-examination Torres disclosed more details about his deals with the

---

[7]At this point in the proceeding, and in front of the jury, the prosecutor asked for permission to question Fierros with leading questions because he was now a hostile witness. Counsel for Garcia stated that perhaps counsel should be appointed for Fierros. The prosecutor responded that he thought counsel should be appointed, "because this is getting into perjury territory." He repeated his concern about perjury. A discussion was held in chambers. Fierros said he did not wish to answer any more questions on Fifth Amendment grounds, "otherwise I could get in trouble." The court told the jury that Fierros had exercised his Fifth Amendment right and was not going to testify anymore. The discontinuation of Fierros's testimony and the issues surrounding it will be discussed under part V.

prosecution. He was arrested on May 25, 2001 with a pound of methamphetamine. He reached a plea agreement in April of 2002. He pled guilty to possession of methamphetamine with the agreement that he would receive no more than 16 months in prison. Between the time of his plea and before sentencing Torres was cooperating with law enforcement to bring them information in the hopes that his sentence would be less than 16 months. His case was continued in July and August. Torres kept asking for more time to gather information. He had not found any information to pass on to law enforcement in October of 2002.

On February 5, 2003, Torres finally came forward with the information he had received from Garcia in October of 2002. In May of 2003 Torres agreed to testify in Garcia's case. In the interim, Torres was arrested in March of 2003 for possession of a handgun. He testified at Garcia's preliminary hearing and was released from jail that day. His new felony charges were reduced to misdemeanors and he received a promise of financial assistance to relocate. He was arrested again in June and August of 2003 and during the current trial in June and July of 2004. He had five cases pending. His cases had been continued with the hope that he would get favorable treatment from the district attorney's office. Torres testified that he came forth with his story regarding Garcia in February of 2003 because Garcia and the other defendants were in jail and he felt safe.

On February 26, 2003 all three defendants were in custody and scheduled for a court appearance. They were transported in a van that had been outfitted with several recording devices. Garcia and Mendoza were placed in the van first. Santana joined them several minutes later.

A tape of the recording was played to the jurors. In the tape Mendoza asked Garcia what he knew and who was talking. Garcia said they are taking fingerprints of everyone who was in the car. Garcia told Mendoza that he told police that they are cousins and sometimes Mendoza would give him a ride to the store. Garcia also said that the police were asking if he knew Pelon and Santana. Mendoza suggested that they say that they do not know anything. Garcia said that is what he has already told them. Mendoza said they should get a lawyer for whomever they find the most fingerprints for. Garcia reported to Mendoza that Rudy and "Queen" (Fierros) were talking and that Santana "is doing well with him [Fierros]." Garcia and Mendoza discussed guns. Garcia said the police got a gun from him and had the gun found in Mendoza's possession. Garcia told Mendoza the police said they had proof who did it and Garcia asked to see the proof.

Garcia continued the conversation and asked why they should pay when they had not done anything. He accompanied this comment with laughter. Santana entered the van. Santana reported to the other two that the "old man" and Ms. Lupe are the ones who were saying everything. Garcia said it's not the old man, it is Ms. Lupe, Santana's pal Rudy and "Tupu" (Torres).

Santana asked where Pelon was. Garcia and Mendoza responded they did not know. Santana suggested they call his "lady" to find him. Garcia said he already knew. Santana suggested that Pelon "could tie those dummies." Garcia said they could not do anything now or they would dig their hole deeper.

The three discussed how cases would go if there was not any evidence. Mendoza asked what was up with "Quini" [Fierros' nickname was Queenie]. Garcia said he did not know where he was. Santana said that "Quini" said he was not going to say anything. Santana said "they" saw Juan, "you guys" [Mendoza and Garcia], and Pelon. Garcia said he told them he would go there for crack. Occasionally throughout

the conversations they indicated that they had not done anything.

The three then discovered the listening devices. Garcia said they did not do anything. Mendoza said they should look for the person who did "that." Garcia said they have us here and the person who did it is out. Santana said they don't have any evidence but they are putting it in the paper so they can come and see who did it. Garcia said they aren't going to find evidence because they weren't the ones who did it.

When Ramon Medina testified, he was asked on cross-examination if he had told Sylvia Brown (Sylvia) that he had set up Santana. Ramon replied that he had not. Based on this cross-examination, the district attorney's office investigated calls made by Sylvia's husband, John Brown (John). John was a cellmate of Santana's in jail. This investigation resulted in Sylvia's testifying at trial.

John and Santana were housed in the same cell in the jail. John was allowed to leave jail for one week on a pass. He returned to jail on May 23, 2004 and continued to share a cell with Santana until his removal on June 22, 2004. John's removal from Santana's cell occurred during the trial in this case.

Sylvia testified that when John was out of jail on a one week pass he told her that Santana wanted her to keep Ramon from testifying. Before the plan was put into action, Ramon had already testified. Santana changed his plan and wanted Sylvia to lie and say that Ramon had set Santana up. John and Sylvia were under the belief that they would be paid for doing this.

Sylvia told Santana's investigator that she saw Ramon, and Ramon told her that he had set up the three defendants. When Santana's defense counsel disclosed this information to the district attorney, the district attorney began an investigation.

Sylvia was interviewed by Detective Dover. In her first interview she lied and stuck to her original story that she had seen Ramon. In her second interview with Dover, he confronted her with the tapes of the conversations among Sylvia, John, and Santana in jail. Sylvia then said the story about Ramon was a lie. Sylvia agreed to testify for the prosecution in exchange for a two-year suspended sentence for conspiracy to commit perjury. Santana and John were the alleged coconspirators.

The tape of the telephone conversation among Sylvia, John, and Santana was played for the jury. The telephone call began between Sylvia and John. John told Sylvia that Ramon had already testified, so if Sylvia wanted to come forward and say that Ramon was lying that would be good. Sylvia asked questions of John, and John asked Sylvia if she wanted to talk to Santana. She said yes, and John summoned Santana to the telephone. Sylvia and Santana spoke in Spanish. Sylvia explained to Santana that she knew him from before and that she is John's wife. Sylvia told Santana that if he needed her to go to court she would go. He said yes. Santana said he was there because of Ramon and La Bomba (Torres). Santana said, "That their [ sic ] telling lies." Sylvia said whatever you need me to do, I'll do. Santana said that if Sylvia did "us" that favor, he would greatly appreciate it. Santana said he already told "him" of the appreciation that he was going to give her. Santana wanted Sylvia's name and address so he could give it to his attorney. Sylvia told Santana that John could provide him all of her details. Santana told Sylvia that when his attorney talks to her she should tell him that the guy told pure lies and that is why he was hiding. Santana also asked Sylvia to look for other girls who know that "they" are liars to come and testify. Santana said he would get in agreement with Sylvia's husband and he appreciated what Sylvia was doing.

1          Sylvia then spoke to John and told him to give Santana her name and address
2    so he could send his lawyer over. She also said she would get other people to back
     him up.

3          The parties stipulated that the bullets recovered from the victim were fired
4    from the same weapon. It was also stipulated that the weapon used to kill the victim
     was not the gun seized from Garcia when he was arrested, it was not the gun seized
     from Mendoza when he was arrested, nor was the murder weapon Pelon's rifle. In
5    addition, the ammunition seized from Santana's home on February 14, 2003, pursuant
     to a search of his house, was not associated with the death of the victim.
6
7          Garcia was arrested at a restaurant. Garcia struggled when he was arrested and
     had a gun in his waistband of his pants. Garcia got his hand on one of the officer's
     service weapons during the struggle. The struggle was described as a life or death
8    struggle, lasting three to four minutes and requiring five people to take Garcia into
     custody.
9

10   (Lod. Doc. 9 at 2-14.)

11                                     **DISCUSSION**

12   **I.      Jurisdiction**

13          A person in custody pursuant to the judgment of a state court may petition a district court for

14   relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or

15   treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529

16   U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by

17   the United States Constitution.  While Petitioner is currently incarcerated at Salinas Valley State

18   Prison in Soledad, California,[8] Petitioner's custody arose from a conviction in the Merced County

19   Superior Court.  (Pet. at 2.)  As Merced County falls within this judicial district, 28 U.S.C. § 84(b),

20   the Court has jurisdiction over Petitioner's application for writ of habeas corpus.  *See* 28 U.S.C. §

21   2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district

22   court where the petitioner is currently in custody or the district court in which a state court convicted

23   and sentenced the petitioner if the state "contains two or more Federal judicial districts").

24   \\\

25   \\\

26   \\\

27   —————————————

28          [8]The city of Soledad falls within Monterey County, which is within the jurisdiction of the Northern District of
     California.  *See* 28 U.S.C. § 84(a).

1    **II.      ADEPA Standard of Review**

2        On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of

3    1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

4    enactment. *Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499

5    (9th Cir. 1997) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996), *overruled on other*

6    *grounds by Lindh*, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's

7    enactment)).  The instant petition was filed in 2008 and is consequently governed by the provisions

8    of the AEDPA.  *See Lockyer v. Andrade*, 538 U.S. 63, 70 (2003).  Thus, the petition "may be granted

9    only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to, or

10   involved an unreasonable application of, clearly established Federal law, as determined by the

11   Supreme Court of the United States.'"  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28

12   U.S.C. § 2254(d)(1)); *see Lockyer*, 538 U.S. at 70-71.

13       Title 28 of the United States Code, section 2254 remains the exclusive vehicle for

14   Petitioner's habeas petition as Petitioner is in custody of the California Department of Corrections

15   and Rehabilitation pursuant to a state court judgment.  *See Sass v. California Board of Prison Terms*,

16   461 F.3d 1123, 1126-1127 (9th Cir. 2006)  *overruled in part on other grounds*, *Hayward v.*

17   *Marshall*, 2010 WL 1664977,*19 (9th Cir. 2010) (en banc).  As a threshold matter, this Court must

18   "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court

19   of the United States.'"  *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining

20   what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the

21   dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  *Id*.

22   (quoting *Williams*, 592 U.S. at 412).  "In other words, 'clearly established Federal law' under §

23   2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time

24   the state court renders its decision."  *Id*.  Finally, this Court must consider whether the state court's

25   decision was "contrary to, or involved an unreasonable application of, clearly established Federal

26   law."  *Lockyer*, 538 U.S. at 72, (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a

27   federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that

28   reached by [the Supreme] Court on a question of law or if the state court decides a case differently

1   than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see*

2   *also Lockyer*, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court

3   may grant the writ if the state court identifies the correct governing legal principle from [the] Court's

4   decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529

5   U.S. at 413.  "[A] federal court may not issue the writ simply because the court concludes in its

6   independent judgment that the relevant state court decision applied clearly established federal law

7   erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.  A federal

8   habeas court making the "unreasonable application" inquiry should ask whether the State court's

9   application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

10      Petitioner bears the burden of establishing that the state court's decision is contrary to or

11   involved an unreasonable application of United States Supreme Court precedent.  *Baylor v. Estelle*,

12   94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth

13   Circuit precedent remains relevant persuasive authority in determining whether a state court decision

14   is objectively unreasonable.  *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While *only* the

15   Supreme Court's precedents are binding on the Arizona court, and only those precedents need be

16   reasonably applied, we may look for guidance to circuit precedents"); *Duhaime v. Ducharme*, 200

17   F.3d 597, 600-601 (9th Cir. 1999) ("because of the 1996 AEDPA amendments, it can no longer

18   reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on

19   a federal Constitutional issue....This does not mean that Ninth Circuit caselaw is never relevant to a

20   habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining

21   whether a particular state court decision is an "unreasonable application" of Supreme Court law, and

22   also may help us determine what law is "clearly established").  Furthermore, the AEDPA requires

23   that the Court give considerable deference to state court decisions.  The state court's factual findings

24   are presumed correct. 28 U.S.C. § 2254(e)(1).  A federal habeas court is bound by a state's

25   interpretation of its own laws.  *Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002).

26      The initial step in applying AEDPA's standards requires a federal habeas court to "identify

27   the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091

28   (9th Cir. 2005).  Where more than one State court has adjudicated Petitioner's claims, the Court

analyzes the last reasoned decision.  *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) for the

presumption that later unexplained orders, upholding a judgment or rejecting the same claim, rests

upon the same ground as the prior order).  Thus, a federal habeas court looks through ambiguous or

unexplained state court decisions to the last reasoned decision in order to determine whether that

decision was contrary to or an unreasonable application of clearly established federal law.  *Bailey v.*

*Rae*, 339 F.3d 1107, 1112-1113 (9th Cir. 2003).  Here, the California Court of Appeal and the

California Supreme Court were the only courts to have adjudicated Petitioner's claims.  As the

California Supreme Court summarily denied Petitioner's claims, the Court looks through those

decisions to the last reasoned decision; namely, that of the California Court of Appeal.  *See Ylst v.*

*Nunnemaker*, 501 U.S. at 804.

**III.    Review of Petitioner's Claims**

   The petition for writ of habeas corpus contains six grounds for relief, all contending that

Petitioner's constitutional rights were violated by: (1) conflict of interest as his trial counsel had

previously represented a witness; (2) trial court's denial of Petitioner's motion to sever his trial from

that of co-defendant; (3) trial court's refusal to strike witness testimony after the witness invoked the

Fifth Amendment privilege against self-incrimination; (4) trial court's issuance of California Jury

Instruction Criminal (CALJIC) No. 3.16 was a structural error as it directed a verdict of guilty; and

(5) issuance of CALJIC No. 2.11.5 was erroneous.

   1.    **Ground One: Conflict of Interest**

   Petitioner's trial counsel unsuccessfully sought a motion to be relieved by the court as

Petitioner's counsel due to a conflict of interest as counsel's office has previously represented a

witness, John Brown, in unrelated proceedings.  Petitioner contends that the trial court's denial of

counsel's motion violated his Sixth Amendment right to counsel.

   The relevant trial court proceedings, as summarized by the State appellate court, were as

follows :

>    After the incident involving the Browns and Santana came to light, counsel for
> Garcia disclosed that he (not personally but as a member of the public defender's
> office) also represented John Brown, who was now a potential witness against
> Santana. Counsel for Santana disclosed that he represented Felipe Ruiz, who was a
> cellmate of Santana and Brown when the pertinent events took place.

The People sought to call John and Sylvia Brown as witnesses. The district attorney had reached an agreement with Sylvia regarding her proposed testimony. It was agreed that she would plead guilty to conspiracy to commit perjury in exchange for a low term sentence that would be suspended. She would receive jail time. The proposed sentence was in exchange for her truthful testimony at this trial.

Recognizing the dilemma, the court asked counsel for Santana and Garcia to consult the State Bar ethics hotline for guidance on the question of the potential conflicts. Santana's counsel stated that he had not gone to talk to Ruiz because of the issue now before the court. The court ordered that no one was allowed to talk to Ruiz at this point in time: this ruling applied to defense counsel, the prosecution, and law enforcement. The People indicated that they had no intention of calling Ruiz as a witness. The district attorney said he would not bring up Ruiz. To this, Santana's counsel stated he could not properly represent Santana without questioning Ruiz, but he could not question Ruiz because he represents him and Santana. Santana repeated this argument throughout the numerous discussions of this issue.

It was argued by the prosecution that if no information had been transmitted to Garcia's attorney from John Brown that would impinge on the attorney's representation of Garcia, then there should not be a problem. The court stated that it did not have a sufficiently convincing offer of proof that John was a necessary witness and was prepared to admit the testimony of Sylvia. Counsel for Garcia argued that if Sylvia were allowed to testify, then Garcia's counsel would want to subpoena John and at that point he (Garcia's counsel) would have to withdraw from representing Garcia in this case.

The court ruled that Sylvia's testimony was admissible with an instruction limiting its use as against Santana only. Counsel for Santana and Garcia said they were going to have to subpoena John as a defense witness. The court responded that it would appoint counsel to represent John and would also appoint independent counsel for Ruiz.

Sylvia was called to testify outside the jury's presence. After she testified, the court said it was going to admit Sylvia's testimony and portions of the tape-recorded jailhouse telephone conversation. Sylvia testified in front of the jury.

John testified outside the presence of the jury and stated that he was going to exercise his right to remain silent. He was called in front of the jury and exercised his right to remain silent. The trial court then denied the motion of Garcia's counsel to be relieved, finding that there was no conflict that necessitated relief.

(Lod. Doc. 9 at 51-52.)

Pursuant to the Sixth Amendment of the United States Constitution, criminal defendants have the right to effective assistance of counsel, which includes the right to counsel free of conflicting interests. *Lewis v. Mayle*, 391 F.3d 989, 997 (9th Cir. 2004) (citing to *Wood v. Georgia*, 450 U.S. 261, 271 (1981) in stating "[t]he Sixth Amendment ensures that a criminal defendant has the right to representation that is free from conflicts of interest and the assistance of counsel whose loyalties are not divided"); *see United States v. Mett*, 65 F.3d 1531, 1534 (9th Cir. 1995).  Consequently, the

1   Ninth Circuit has found that where a criminal defendant moves to relieve trial counsel based on a

2   conflict of interest, " it is well established and clear that the Sixth Amendment required on the record

3   an appropriate inquiry into grounds for such a motion, and that the matter be resolved on the merits

4   before the case goes forward." *See Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (finding trial

5   court's failure to rule on motion to substitute counsel based on conflict of interest was erroneous and

6   that evidentiary hearing was required to determine the extent to which counsel and petitioner's

7   relationship had deteriorated).  Here, there is no allegation that the trial court's failed to conduct an

8   appropriate inquiry into the conflict of interest; rather, Petitioner alleges that the trial court's denial

9   of the motion to relieve counsel was erroneous.

10       The California Court of Appeal rejected this argument, finding that Petitioner had failed to

11   show that counsel's performance had been adversely affected by the asserted conflict under the

12   federal standard.  (Lod. Doc. 9 at 55.)  The appellate court also noted that Petitioner could not

13   succeed under the more favorable California standard as the record did not support an *informed*

14   *speculation* that counsel's performance had been adversely affected by the asserted conflict of

15   interest.  The appellate court stated:

16           Although Garcia's counsel repeatedly stated that severance was required
         because he also represented John and this caused a conflict of interest, at no time did
17       Garcia's counsel ever suggest that he was in possession of any information from John
         that would be relevant to Garcia's defense that he could not disclose because of his
18       representation of John. That Garcia's counsel did not possess such information is
         supported by the record. There is nothing in the record showing that Garcia's counsel
19       was aware that Santana's cellmate, John, was involved in a scheme with Santana to
         present untruthful testimony via Sylvia. There is nothing in the record to even suggest
20       that Garcia's counsel was aware that a cellmate of Santana was represented by him or
         his office. Thus, the chance that Garcia's counsel would have information about the
21       scheme from John was not shown or even inferable from the record....
             [C]ounsel here made no good faith showing whatsoever that he was in
22       possession of confidential information from John that created a conflict. Furthermore,
         we do not find anything in the record to support a finding that counsel for Garcia
23       "pulled his punches" and failed to represent Garcia as vigorously as he might have in
         the absence of the asserted conflict. We do not see how Garcia's counsel's failure to
24       object to John's exercising his right to refuse to testify in front of the jury
         demonstrated a conflict or adversely affected counsel's performance in representing
25       Garcia. If Garcia's counsel thought the decision to call John before the jury to invoke
         his right to remain silent was so critical to John personally, counsel could have
26       informed the court of the dilemma he now raises for the first time on appeal without
         divulging any confidences and without harming either Garcia or John.

27

28   (Id. at 55-56.)

As the California Court of Appeal correctly noted under the federal standard Petitioner is required to "demonstrate that an actual conflict of interest adversely affected his lawyer's performance" in order to obtain habeas corpus relief. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *Mett*, 65 F.3d at 1534; *see also Mickens*, 535 U.S. 162, 172 n.5 (2002) ("An 'actual conflict' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance"). While claims predicated on the deprivation of a defendant's Sixth Amendment rights generally require a showing of both deficient performance and prejudice, *see Strickland v. Washington*, 466 U.S. 668, 687(1984), a defendant need not show prejudice for a claim predicated on counsel's conflict of interest, *see Cuyler*, 446 U.S. at 349-350. The Supreme Court noted in *Cuyler* that "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 349-350 (citations omitted); *see also Sanders*, 21 F.3d at 1452 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978) in stating that "[o]nce an actual conflict has been demonstrated, prejudice is presumed since the harm may not consist solely of what counsel does, but of 'what the advocate finds himself compelled to *refrain* from doing, not only at trial but also' during pretrial proceedings and preparation") (emphasis in original). In *Lewis v. Mayle*, 391 F.3d at 997-998, the Ninth Circuit found a conflict of interest as the attorney's previous representation of a witness adversely affected the defense presented at trial. The *Lewis* court found significant the fact that trial counsel refrained from eliciting evidence on at least three points, including an instance in which counsel failed to present evidence discrediting the witness with information obtained from the attorney's previous representation of the witness.

Here, Petitioner alleges in a conclusory fashion that trial counsel possessed confidential information obtained form his office's previous representation of Brown that would have been advantageous to his defense. As noted by the appellate court, the record contradicts such an assertion as there is no indication that trial counsel in fact possessed any information obtained from his office's representation of Brown that was pertinent to Petitioner's defense. More importantly, Petitioner does not advance the argument that counsel's representation was adversely affected by his conflict of interest other than to argue that counsel's cross examination of Sylvia Brown was directed

at attacking only her credibility. (Traverse at 5.) However, Petitioner does not address what other information trial counsel should have elicited during cross examination. As the Court finds such an allegation insufficient support for Petitioner's claim that counsel's representation was adversely affected by the alleged conflict of interest, the Court does not find the California Court of Appeal's rejection of this claim to be an objectively unreasonable application of *Cuyler*.

Alternatively, Petitioner advances the argument that adverse affects are not required as there was a *per se* conflict of interest. In support of this proposition, Petitioner cites to *United States v. Fulton*, 5 F.3d 605 (2d Cir. 1993) and *United States v. Schwarz*, 283 F.3d 76, 95 (2d Cir. 2002). The Court finds Petitioner's argument unpersuasive as neither case supports Petitioner's proposition that a *per se* conflict of interest is applicable to Petitioner's case. The Court initially notes that neither case is binding authority on this Court. More importantly, *Schwarz* and *Fulton* are factually distinguishable from Petitioner's case. In *Schwarz*, counsel represented a police officer accused of police brutality while his firm had been retained for $10 million dollars to represent a police officers' association that was a defendant in a civil suit pertaining to the same incident. The Second Circuit in *Schwarz* did in fact find that counsel's representation was adversely affected by the conflict of interest as counsel failed to pursue a plausible alternate defense that was beneficial to defendant but harmful to the police association. *Schwarz*, 283 F.3d at 95. Thus, contrary to Petitioner's assertion otherwise, the *Schwarz* court did not in fact that there was a *per se* conflict; rather, the *Schwarz* court found that this conflict of interest could not be waived. *See Schwarz*, 283 F.3d at 96-97 ("In sum, we hold that Schwarz's counsel suffered an actual conflict, that the conflict adversely affected his counsel's representation, and that the conflict was unwaivable"). The Second Circuit found the conflict unwaivable as counsel's ethical obligation to his client and counsel's own self interest in the retainer for another client was so severe that no rational defendant would have knowingly and intelligently desired counsel's representation. Petitioner mistakes the Second Circuit's finding, that the conflict was not subject to waiver, with the premise that the there is a *per se* conflict which does not require a showing of adverse affects. As the *Schwarz* court itself required a conflict that adversely affect's counsel's performance before finding a violation of the Sixth Amendment, the Court finds Petitioner's reliance on *Schwarz* unavailing for this argument.

1    In *Fulton*, the Second Circuit held that a conflict of interest exists *per se* where defense

2    counsel was implicated in the crime for which defendant was being tried.  The defendant had been

3    convicted of conspiracy to possess and import heroin.  During the course of the trial, it was

4    discovered that defense counsel in *Fulton* had been named by a government witness as a receiver of

5    the heroin that had been smuggled in and had been involved in trafficking heroin himself.  While the

6    defendant had agreed for counsel to continue his representation at trial after the trial court apprised

7    defendant of the situation, the Second Circuit found that this conflict was unwaivable.  *Fulton*, 5

8    F.3d at 613.  The *Fulton* court further found that a *per se* rule applicable to the facts in *Fulton* as

9    "[t]he per se rule applies when an attorney is implicated in the crimes of his or her client since, in

10   that event, the attorney cannot be free from fear that a vigorous defense should lead the prosecutor or

11   the trial judge to discover evidence of the attorney's own wrongdoing."  *Id*. at 611.  The Second

12   Circuit's rationale for this *per se* conflict rested on the conflicting interest that any counsel in such

13   circumstances would possess in not pursuing a vigorous defense as such a defense might uncover

14   evidence inculpating counsel.  Thus, as recognized by the Second Circuit, the rulings in both

15   *Schwarz* and *Fulton* are limited to the facts of those cases and apply to only a "very narrow category

16   of cases."  *United States v. Perez*, 325 F.3d 115, 126-127 (2d Cir. 2003).  Here, there is no argument

17   that trial counsel possessed the type of severe conflict of interest that existed in either *Schwarz* or

18   *Fulton* that would necessitate a finding of a *per se* conflict of interest and thus the Court rejects

19   Petitioner's argument that this is a *per se* conflict of interest.

20   As Petitioner has not demonstrated that counsel's representation was adversely affected by

21   the alleged conflict of interest and the alleged conflict is not a *per se* conflict of interest, the Court

22   finds that Petitioner is not entitled to habeas corpus relief on this ground.

23   **2**.    **Ground Two: Severance**

24   Respondent contends that Petitioner failed to exhaust this claim as Petitioner, himself, did not

25   raise this claim to the California Supreme Court in his petition for review.  As a federal habeas court

26   may deny a petition on the merits despite Petitioner's failure to exhaust, the Court may bypass the

27

28

1   exhaustion issue and proceed directly to the merits of Petitioner's claim.[9]  *See* 28 U.S.C. §

2   2254(b)(2); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002).

3        A court may grant habeas relief based on the state court's denial of a motion for severance

4   only if the joint trial was so prejudicial that it denied the petitioner his right to a fair trial.  *See Zafiro*

5   *v. United States*, 506 U.S. 534, 538-539 (1993) (court must decide if "there is a serious risk that a

6   joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from

7   making a reliable judgment about guilt or innocence"); *United States v. Lane*, 474 U.S. 438, 446 n. 8

8   (1986) ("misjoinder would rise to the level of a constitutional violation only if it results in prejudice

9   so great as to deny a defendant his Fifth Amendment right to a fair trial"); *Featherstone v. Estelle*,

10  948 F.2d 1497, 1503 (9th Cir.1991) (same).  To prevail on a habeas claim based on a trial court's

11  refusal to sever the petitioner's trial from his co-defendant, petitioner "bears the burden of

12  demonstrating that the state court's denial of his severance motion rendered his trial fundamentally

13  unfair," *see Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997), and must establish that prejudice

14  arising from the failure to sever was so "clear, manifest, and undue" that he was denied a fair trial.

15  *see Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir.1999) (quoting *United States v.*

16  *Throckmorton*, 87 F.3d 1069, 1071-72 (9th Cir.1996)).   A trial is rendered fundamentally unfair "if

17  the impermissible joinder had a substantial and injurious effect or influence in determining the jury's

18  verdict." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

19  \\\

20  \\\

21  _____

22       [9]This issue was raised by Petitioner's co-defendant, Santana, in his petition for review.  The petitions for review by
    Petitioner, Santana, and Mendoza were consolidated into one case (Case No. S1518178) before the California Supreme Court,
23  which issued a decision denying the petitions for review.  "An application for a writ of habeas corpus on behalf of a person
    in custody pursuant to the judgment of a State court shall not be granted unless it appears that...the applicant has exhausted
24  the remedies available in the courts of the State."   See 28 U.S.C. § 2254(b)(1)(A).  A petitioner can satisfy exhaustion by
    fairly and fully presenting each federal claim to the state's highest court.  *See Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir.
25  1996); *see also Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005).  "A petitioner fairly and fully presents a claim
    to the state court for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum, (2)
26  through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim."   *Insyxiengmay*, 403 F.3d
    at 668 (citation omitted).  Here, the appeals of all three criminal defendants were consolidated into one case before both the
27  California Supreme Court and the California Court of Appeal (Case No. F046760) and both State courts issued one reasoned
    decision for the consolidated case.  The Court thinks it would be redundant to require that Petitioner has raised the claims
28  contained in his co-defendant's petition for review in order to exhaust in light of these circumstances as there is no reasonable
    argument that the State courts were not fairly and fully apprised of the claims.

On habeas review, federal courts neither depend "on the state law governing severance in state trials" nor "consider procedural rights afforded in federal trials." *Grisby*, 130 F.3d at 370 (citing *Hollins v. Dep't of Corrections, State of Iowa*, 969 F.2d 606, 608 (8th Cir. 1992)). Instead, the relevant question is whether the State court's decision not to sever the trial violated Petitioner's due process rights. *Grisby*, 130 F.3d at 370; *see Featherstone*, 948 F.2d at 1503 ("simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate") (internal quotation marks and citation omitted).

There is a preference for joint trials of defendants who are indicted together, unless mutually antagonistic or irreconcilable defenses may be so prejudicial as to mandate severance. *See Zafiro*, 506 U.S. at 538. Severance should be granted only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 539. Here, there is no allegation that Santana or Mendoza had mutually antagonistic defenses that were irreconcilable with the core of Petitioner's own defense such that "acceptance of the co defendant's theory by the jury precludes acquittal of the defendant."[10] *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996); *see also Cooper v. McGrath*, 314 F.Supp.2d 967, 983 (N.D. Cal. 2004). Rather, Petitioner's contention that the motion for severance should have been granted is based upon alleged prejudice stemming from Sylvia Brown's testimony that Santana bribed her to commit perjury. Here, the California Court of Appeal found that no prejudice resulted from a failure to sever the trial as the trial court had clearly instructed the jury that it could not use the evidence of Santana's dealings with Brown against either Mendoza or Petitioner. (Lod. Doc. 9 at 51.) The appellate court noted that the contents of Sylvia Brown's testimony's was not so prejudicial that the jurors ignored the trial court's admonitions. Petitioner argues that the prosecutor's statements regarding Santana's bribery and subordination or perjury charges conveyed the image that all three defendants "hatched this plan." (Pet. at 5(b).) The

---

[10]The Ninth Circuit in *Collins v. Runnels*,__F.3d___, 2010 WL 1780870, * 5 (9th Cir. 2010) recently clarified that for AEDPA purposes, "neither *Zafiro v. United States* nor *United States v. Lane* establish a constitutional standard binding on the states requiring severance in cases where defendants present mutually antagonistic defenses." Thus, even if the defenses were antagonistic, Petitioner would not be entitled to habeas corpus relief.

1    prosecutors actual statement was:

2           Ladies and gentlemen, this is a detailed tapestry of direct evidence, circumstantial
            evidence, and just plain old common sense as to what happened.  It weaves a clear
3           and unmistakable image and that is that these three hatched this plan with Pelon.
            They carried it out, they murdered and then sought to cover it up through threats,
4           intimidation and *in the case of Henry Santana, bribery and perjury*.

5    (RT at 2713) (emphasis added).  Petitioner's contention that this statement invited the jury to use

6    evidence relating to the bribery of Sylvia Brown against Petitioner and Mendoza must fail.  While

7    the prosecutor alludes to the participation of all three defendants in the plan with Pelon, the

8    prosecutor's statements make clear that the bribery and perjury evidence pertained only to Santana.

9           Additionally, the Court agrees with the State appellate court that any prejudice that might

10   have resulted from the introduction of this evidence was dissipated by the trial court's instruction to

11   the jury that they could only consider the testimony of Sylvia Brown against Santana.  In fact the trial

12   court emphasized this, admonishing the jury that "[t]here's going to be testimony here from Ms.

13   Brown and accompanied by a recording which, as you already know, will be played in court and you

14   will be provided transcripts. *This testimony is limited, to be considered against Mr. Santana only.*

15   *Mr. Santana.  Not to be considered against Mr. Garcia or Mr. Mendoza*."  (RT at 2254) (emphasis

16   added).  Additionally, in the instructions the court issued prior to closing argument, the jury was

17   reminded "[e]vidence has been omitted against one of more of the defendants, and not admitted

18   against the others.  ¶  At the time this evidence was admitted you were instructed that it could not be

19   considered by you against the other defendants.   ¶ Do not consider this evidence against the other

20   defendants."  (RT at 2654.)  As the presumption exists that jurors followed the trial court's

21   instruction, *see Fields v. Brown*, 503 F.3d 755, 781 (9th Cir. 2007) (citing *Richardson v. Marsh*, 481

22   U.S. 200, 206,(1987)), the Court must presume that the jurors did not consider the evidence relating

23   to the bribery and perjury of Sylvia Brown against anyone other than Santana.  As noted by the

24   California Court of Appeal, Petitioner's ability to make a showing that he was prejudiced by the

25   denial of the severance motion is also hampered by the abundance of independent evidence

26   establishing Petitioner's and Mendoza's guilt that had been admitted prior to Sylvia Brown's

27   testimony.  (Lod. Doc. 9 at 50.)  Thus, the Court finds that the California Court of Appeal's decision

28   was reasonable because the abundance of independent evidence and the trial court's instructions

weigh heavily against a finding that the denial of the severance motion had "a substantial and injurious effect or influence in determining the jury's verdict." *Sandoval*, 241 F.3d at 772. Therefore, Petitioner is not entitled to habeas corpus relief on this ground.

### 3.      Ground Three: Refusal to Strike Witness Testimony

Petitioner contends that his Confrontation Clause rights were violated when the trial court refused to strike the testimony of Isais Fierros.  The state court summarized the facts as they pertain to this ground for relief, stating:

> On cross-examination, Fierros began to change his story. He said that Mendoza wanted the money for Pelon's bail. He testified that he made up stories for the police because he was concerned about his child and he wanted to get Garcia and Mendoza off the street. When he first called the police to tell them that someone had tried to take his child, the officer told him he was not a babysitter and he should make his report in person. Fierros was angry enough with Garcia to tell lies about him and to kill him. Fierros wanted Garcia arrested and off the streets. Fierros told police that Mendoza's car might be found in Oakland, but Fierros did not drive the car there. Fierros testified that Garcia did not confess a murder to him, but perhaps he gave that impression to the police because he needed the police to get Garcia locked up. Fierros testified that Mendoza never asked him for money because of a murder. Fierros was mad at Mendoza and wanted him off the streets. Fierros said he was telling the truth now in court.

> On redirect examination, Fierros starting repeating the version of events he told on cross-examination. He testified that Mendoza did call him and ask him for money but Mendoza did not say he was going to kill Fierros nor did Mendoza tell Fierros he killed a man in Merced. Fierros made up a lot of things he told police with the purpose of getting Mendoza and Garcia off the streets.

> At this point in the proceeding, and in front of the jury, the prosecutor asked to question Fierros with leading questions because he was now a hostile witness. Counsel for Garcia stated that perhaps counsel should be appointed for Fierros. The prosecutor responded that he thought counsel should be appointed, "because this is getting into perjury territory." The district attorney mentioned perjury again.

> A recess was taken until the next morning. The court memorialized that a discussion had occurred in chambers and at this point in time it was the court's understanding that Fierros did not wish to answer any more questions on Fifth Amendment grounds. The court questioned Fierros and he said he did not wish to answer any more questions on Fifth Amendment grounds, "otherwise I would get in trouble." The court told the jury that Fierros has exercised his Fifth Amendment right and was not going to testify anymore.

> Shortly thereafter the following occurred:

> "MR. PRO: [Counsel for Garcia] While we're on the record also, we had talked in chambers a little bit, but I would like to put on the record my objection to the request to have the entire testimony stricken because he is refusing to testify further.

1    "THE COURT: I could take that under advisement, Mr. Pro. I'm looking for
     some authority there.

2

3    "MR. PRO: I understand that.

     "THE COURT: I assume that at the time you're able to research that you'll
4    present that to me and the court can make a ruling.

5    "MR. PRO: I just wanted to make sure that I got that on the record."

6        Officer McKnight was called to testify regarding Fierros's report to him at the
     police station. His testimony was for impeachment to show inconsistent statements of
7    Fierros at trial and in the report.

8    (Lod. Doc. 9 at 40-41.)

9        Petitioner contends the trial court violated his Confrontation Clause rights by failing to strike

10   Fierros' entire testimony and by permitting Officer McKnight to testify to Fierros' prior statements

11   as Petitioner was not afforded a full cross examination of Fierros.  The Confrontation Clause protects

12   a defendant from unreliable hearsay evidence being presented against him during trial.  *See* U.S.

13   Constitution, Amendment VI.  The Confrontation Clause of the Sixth Amendment specifically

14   provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted

15   with the witnesses against him."  *Id.*  The Sixth Amendment's Confrontation Clause was made

16   applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *Melendez-*

17   *Diaz v. Massachusetts*, 129 S.Ct. 2527, 2531 (2009) (citing *Pointer v. Texas*, 380 U.S. 400, 403

18   (1965)).   In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that

19   the Confrontation Clause bars the state from introducing out-of-court statements which are

20   testimonial in nature, unless "the declarant is unavailable, and only where the defendant has had a

21   prior opportunity to cross-examine."  *Crawford*, 541 U.S. at 59.   "The main and essential purpose of

22   confrontation is to secure for the opponent the opportunity of cross-examination."  *Davis v. Alaska*,

23   415 U.S. 308, 315-316 (1974).  However, while the Confrontation Clause of the Sixth Amendment

24   "'guarantees an opportunity for effective cross-examination,' this does not mean 'cross-examination

25   that is effective in whatever way, and to whatever extent, the defense might wish.'"  *Delaware v.*

26   *Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per

27   curiam)).

28   \\\

1    Here, Petitioner does not allege that he was entirely deprived of the opportunity to cross

2    examine Fierros; rather, Petitioner argues he did not receive a full opportunity to cross examine

3    Fierros.  The California Court of Appeal rejected this claim, finding that all three defendant were

4    given a full opportunity to cross examine the witness.[11]  The appellate court noted that it was actually

5    the prosecution's re-direct examination that had been cut short due to Fierros' invocation of the Fifth

6    Amendment.  While Respondent is correct that the right to be confronted with witnesses against him

7    encompasses the right to effective cross examination, the Court does not find that Petitioner was

8    deprived of this right in the instant case.  *See United States v. Ganoe*, 538 F. 1117, 1125 (9th Cir.

9    2008) (quoting *United States v. Larson*, 495 F.3d 1094, 1101-02 (9th Cir. 2007) (en banc)).  The

10   Ninth Circuit has explicitly identified three factors to consider in determining whether a defendant's

11   right to effective cross-examination was violated: "(1) whether the excluded evidence was relevant;

12   (2) whether there were other legitimate interests outweighing the defendant's interest in presenting

13   the evidence; and (3) whether the exclusion of evidence left the jury with sufficient information to

14   assess the credibility of the witness."  *Larson*, 495 F.3d at 1103.  Here, Petitioner does not allege any

15   relevant evidence was excluded from his inability to further cross examine Fierros.  Additionally, the

16   legitimate interest outweighing Petitioner's continued questioning of Fierros was Fierros' invocation

17   of his Fifth Amendment right, which was clearly warranted in this circumstance as Fierros presented

18   two conflicting stories on direct and cross examination thus subjecting himself to possible

19   prosecution for perjury.  Lastly, the Court finds that the direct and cross examination of Fierros

20   provided the jury with sufficient information to assess the credibility of the witness as the jury

21   witnessed first hand Fierros confess about lying to incriminate the defendants and his motivations for

22   doing so.  This is not a case where Petitioner had no opportunity to confront the witness about why

23   the witness' prior statements.  *See United States v. Wilmore*, 381 F.3d 868, 872 (finding violation of

24   Confrontation Clause where trial court limited cross examination to topics other than witness' grand

25   jury testimony, which contradicted her testimony in court).  In contrast, Petitioner's counsel had a

---

[11] The appellate court's discussion of the issue on the merits is limited, as the decision mainly addresses Petitioner's failure to preserve this claim on appeal and thus the state procedural rule that barred relief.  (Lod. Doc. 9 at 41-42).  As Respondent does not raise the affirmative defense of procedural default, the Court limits its discussion of this issue to the merits of the claim.

1   thorough opportunity to cross examine Fierros, (RT at 1426-1450), during which Fierros recanted his

2   previous statements and admitted his bias for previously incriminating Petitioner.  Therefore, the

3   Court finds that the California Court of Appeal's decision was not an objectively unreasonable

4   application of *Crawford*.

5        Moreover, even if it was constitutional error for the trial court to refuse to strike Fierros'

6   testimony, the alleged error did not have a "substantial and injurious effect or influence in

7   determining the jury's verdict" and was therefore harmless as Fierros recanted his allegations that

8   Petitioner was involved in the murder.  *See Brecht*, 507 U.S. at 637-38; *see also Fry v. Pliler*, 551

9   U.S. 112, 121-22 (2007) (federal court on state habeas review should apply *Brecht* harmless error

10  standard even if state court did not recognize the error or conduct a harmless error analysis).

11       **4.       Ground Four: Issuance of CALJIC No. 3.16**

12       Petitioner contends that the trial court erred in issuing a modified version of CALJIC No.

13  3.16 as the instruction directed a guilty verdict against Petitioner and denied him his constitutional

14  right to have a jury finding on the issue of guilt beyond a reasonable doubt.

15       To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

16  error so infected the entire trial that the resulting conviction violates due process.  *Estelle v.*

17  *McGuire*, 502 U.S. 62, 72 (1991); *see Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp*

18  *v. Naughten*, 414 U.S. 141, 146-47 (1973) in finding that a habeas court must not merely consider

19  whether an "instruction is undesirable, erroneous, or even universally condemned" but must instead

20  determine "'whether the ailing instruction by itself so infected the entire trial that the resulting

21  conviction violates due process'"); *see also Waddington v. Sarausad*, 129 S.Ct. 823, 832 (2009)

22  (noting that the pertinent question is whether the ailing instruction by itself so infected the entire trial

23  that the resulting conviction violates due process").  An erroneous jury instruction "directed toward

24  an element of the offense may rise to the level of a constitutional defect."  *Byrd v. Lewis*, 566 F.3d

25  855, 862 (9th Cir. 2009) (citing *Neder v. United States*, 527 U.S. 1, 9-10 (1999)).  "Due process

26  requires that jury instructions in criminal trials give effect to the prosecutor's burden of proving

27  every element of the crime charged beyond a reasonable doubt. [Citation] 'Nonetheless, not every

28  ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process

1   violation.'" *Townsend v. Knowles*, 562 F.3d 1200, 1209 (9th Cir. 2009) (quoting *Middleton v.*

2   *McNeil*, 541 U.S. 433, 437 (2004) (per curiam)).   Additionally, "[t]he jury instruction may not be

3   judged in artificial isolation, but must be considered in the context of the instructions as a whole and

4   the trial record." *Id*. (citation and internal quotation marks omitted).   "If the charge as a whole is

5   ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the

6   challenged instruction in a way that violates the Constitution." *Middleton*, 541 U.S. at 437.

7   　　　Here, Petitioner challenges the trial court's issuance of CALJIC No. 3.16.   The trial court's

8   instruction stated "[i]f the crimes alleged herein were committed by anyone, Francisco Garcia was an

9   accomplice as a matter of law and his statement is subject to the rule requiring corroboration."   (CT

10  at 568.)   Petitioner's argument that CALJIC No. 3.16 violates his constitutional rights is predicated

11  on the theory of accomplice liability; specifically, the idea that an accomplice is equally as liable as a

12  principal.   Thus, an instruction that Petitioner is an accomplice would permit the jury to find

13  Petitioner guilty on the theory of accomplice liability without having considered any evidence that

14  Petitioner was either an accomplice or a principal.

15  　　　The California Court of Appeal rejected Petitioner's claim, finding that the jury instruction

16  was neither erroneous nor did it direct a guilty verdict against Petitioner, stating:

17  　　　　　Garcia contends the instruction that Garcia was an accomplice as a matter of
　　　　law directed a verdict of guilty and denied him his right to a jury verdict of guilty
18  　　　　beyond a reasonable doubt. He argues that the error is a structural error requiring
　　　　reversal per se.
19
　　　　　As previously set forth, an accomplice was defined as "a person who was
20  　　　　subject to prosecution for the identical offense charged against the defendant on trial
　　　　by reason of aiding and abetting or being a member of a criminal conspiracy." That
21  　　　　Garcia was a person who was subject to prosecution for the identical offenses charged
　　　　against Santana and Mendoza was self-evident from the fact that he was on trial for
22  　　　　the identical offenses charged against Mendoza and Santana. He therefore met the
　　　　definition of an accomplice as a matter of law. The instruction did not tell the jury
23  　　　　that Garcia was a principal as a matter of law. In light of the instruction defining an
　　　　accomplice, there is no reasonable likelihood that jurors might have interpreted the
24  　　　　instruction in question as directing a verdict against Garcia in whole or in part.
　　(Lod. Doc. 9 at 59.)
25
　　\\\
26  　　\\\
27  　　\\\
28

1    Review of the jury charge as a whole does not reveal that a reasonable juror would have

2  understood the instruction to mean that because Petitioner was an accomplice, he was liable for the

3  offenses as a matter of law.  The trial court initially instructed the jury that "persons who are

4  involved in committing a crime are referred to as principals in that crime.  Each principal, regardless

5  of the extent or manner of participation is equally guilty."  (RT at 2664; CT at 567.)  The court then

6  defined principals to include both those who "actively commit the act constituting the crime" and

7  those who "aid and abet the commission of the crime."  (RT at 2664-2665; CT at 567.)  Thus,

8  someone who aids and abets the perpetrator of the crime is a principal and is equally liable for the

9  crime.  The trial court went on to instruct the jury that "[a]n accomplice is a person who was subject

10  to prosecution for the identical offense charged against the defendant on trial by reason of aiding and

11  abetting or being a member of a criminal conspiracy," (RT at 2665; CT at 567), and that the

12  testimony of such a person required independent corroboration.[12]  (RT at 2665-2667; CT at 567-

13  568.)  The trial court then issued CALJIC No. 3.16, which Petitioner contends directed the verdict

14  against him.

15    While the Court finds that the trial court's issuance of the instruction was erroneous,[13]

16  Petitioner cannot demonstrate that the trial court's erroneous issuance of CALJIC No. 3.16 rose to

17  the level of a due process violation.  The Court does not find it to be reasonably likely that the jury

18  understood the instruction, especially in the context of the jury charge as a whole, to mean that

19  Petitioner was an aider and abettor or a conspirator as a matter of law.  As noted previously, the jury

20  instruction  merely states that Petitioner was subject to prosecution under the theory that he was an

21  aider and abettor, not that he was as a matter of law an aider and abettor.   The appellate court noted

22  this distinction, emphasizing that, "[t]he instruction did not tell the jury that Garcia was a principal

23  as a matter of law."  (Lod. Doc. 9 at 59.)

---

[12]The trial court's issuance of this instruction is mandated under California Penal Code section 1111, stating that "a conviction cannot be had upon the testimony of an accomplice unless it be corroborated."

[13]The Court acknowledges that the issuance of CALJIC No. 3.16 in this case was likely erroneous as the California Supreme Court advised against issuing CALJIC No. 3.16 where the accomplice is a co-defendant. *See People v. Hill*, 66 Cal. 2d 536 (1967).  The *Hill* court observed that issuance of this instruction where a co-defendant is the confessing party would unfairly prejudice the *other* co-defendants in the eyes of the jury. *See id.* at 555-556 (upholding trial court's refusal to issue instruction where accomplice was co-defendant in trial).

1      This conclusion is further supported by the jury's findings relating to the special allegations.

2  The jury in this case was instructed that upon its finding that a defendant was guilty of first degree

3  murder, they were also to decide whether the special allegation–that the defendant committed the

4  crime during the commission of kidnaping or torture–were true.  The court specifically instructed the

5  jury that "[y]ou must decide *separately as to each of the defendants* the existence or nonexistence of

6  each special circumstance alleged in this case."  (CT at 573; RT at 2679.)  The jury returned a verdict

7  against Petitioner, finding true the special allegations that Petitioner committed the first degree

8  murder charge in the commission of the kidnaping and torture of the victim.  (RT at 2953-2954.)  In

9  light of this jury finding, the Court does not believe it is possible for the jury to have applied CALJIC

10  No. 3.16 in the manner proposed by Petitioner–namely to find Petitioner guilty solely on the theory

11  of accomplice liability where the trial court instructed the jury that Petitioner was an accomplice as a

12  matter of law.  The jury's special findings make clear that the accomplice instruction did not

13  influence the jury's verdict as the jury obviously found Petitioner was a perpetrator and not merely

14  an accomplice.

15      Even if the erroneous instruction rose to the level of a due process violation, the Court finds,

16  however, that in Petitioner's circumstance, this error is harmless.[14]  As noted by the United States

17  Supreme Court in *Neder v. United States*, 527 U.S. 1, 9 (1999), harmless error analysis generally

18  applies in cases of instructional error.  However, the Supreme Court has stated that a directed verdict

19  would presumably not be subject to review under harmless error as an error of that magnitude would

20  be reversible *per se.  Rose v. Clark*, 478 U.S. 570, 578 (1986) (quoting *Duncan v. Louisiana*, 391

21  U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) in stating that "[t]his rule stems from the Sixth

22  Amendment's clear command to afford jury trials in serious criminal cases...Where that right is

23  altogether denied, the State cannot contend that the deprivation was harmless because the evidence

24  established the defendant's guilt; the error in such a case is that the wrong entity judged the defendant

25  guilty").  As noted by the Supreme Court:

26      in a jury trial the primary finders of fact are the jurors. Their overriding responsibility

27

28      [14]Presuming that the District Court adopts this findings, the Court would recommend issuance of a certificate of appealability on this issue.

1   is to stand between the accused and a potentially arbitrary or abusive Government that
2   is in command of the criminal sanction. For this reason, a trial judge is prohibited
    from entering a judgment of conviction or directing the jury to come forward with
3   such a verdict, *see Sparf & Hansen v. United States*, 156 U.S. 51, 105, 15 S.Ct. 273,
    294, 39 L.Ed. 343 (1895); *Carpenters v. United States*, 330 U.S. 395, 408, 67 S.Ct.
4   775, 782, 91 L.Ed. 973 (1947), regardless of how overwhelmingly the evidence may
    point in that direction. The trial judge is thereby barred from attempting to override or
5   interfere with the jurors' independent judgment in a manner contrary to the interests
    of the accused.

6   *United States v. Martin Linen Supply Co.*, 430 US 564, 572-573 (1977).

7          The Ninth Circuit found that the failure to instruct on an element of the offense constituted a

8   directed verdict in *Powell v. Galaza*, 328 F.3d 558, 566 (9th Cir. 2003).  However, the instructional

9   error complained of here is not analogous to the error in *Powell* as the Ninth Circuit in *Powell*

10  confronted a case where the trial court instructed the jury that the defendant's testimony satisfied the

11  specific intent element required for the crime.  As the specific intent element was the only disputed

12  element in *Powell* and as there was nothing left for the jury to find, the instruction was tantamount to

13  a directed verdict.  Rather, the Court finds the complained of error is more analogous to instructing

14  on an invalid theory of liability.  *Neder*, 527 US at 9-10 (quoting *Johnson v United States*, 520 US

15  461, 469(1997) in stating that "improperly omitting an element from the jury can 'easily be

16  analogized to improperly instructing the jury on an element of the offense,'"); *see Hedgpeth v.*

17  *Pulido*, 129 S. Ct. 530, 532 (2008) (per curiam) (applying harmless error analysis to jury instruction

18  containing an invalid theory of felony murder whereby jury).  The *Pulido* court rejected the argument

19  that instructing a jury on multiple theories of guilt, one of which was legally improper, was a

20  structural error, stating that "[a]n instructional error arising in the context of multiple theories of guilt

21  no more vitiates all the jury's findings than does omission or misstatement of an element of the

22  offense when only one theory is submitted." *Id*.  In sum, the *Pulido* court "reinforced the holding in

23  *Neder* that unless all the jury's findings are vitiated, harmless error review applies." *Byrd v. Lewis*,

24  566 F.3d 855, 864 (9th Cir. 2009) ("In *Pulido*, the Court left no doubt that its intent in *Neder* was to

25  limit structural error review to those trial deficiencies that negated all the jury's findings, rather than

26  to a preliminary finding that merely contributed to the ultimate determination of guilt").  In the

27  instant case, as evidenced by the jury's special findings, not all of the jury's findings were vitiated by

28  the accomplice instruction.  Thus, Petitioner's case is subject to a harmless error analysis.

The Supreme Court made clear in *Fry v. Pliler*, 551 U.S. 112, 119-120 (2007), that a federal habeas court must assess the prejudicial impact of a constitutional error under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).  The *Brecht* standard requires the court to ascertain whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Fry*, 551 U.S. at 121-122.  Here, the Court finds the error harmless.  The record reveals that there was an abundance of evidence that Petitioner was at the very least an accomplice to the crime.  Petitioner's fingerprints were found inside the rear passenger window of a car (RT at 1642-1643), that also contained the victim's blood (RT at 497-498, 1666, 1677.)  David Medina identified Petitioner as one of the men who brought a hooded man to the house on the day of the murder and who then left with the man.  (RT at 862-863, 870.)  Ramon Medina also testified that Petitioner was one of the men who showed up at the Merced house with a bleeding man who they then took to the back room.  (RT at 948-951.)  Scott Rufer identified Petitioner as part of the group of men who brought a man with a hood over his head to his house. (RT at 712-713.)  This testimony was corroborated by Maria Bustos, who testified that Petitioner was holding onto the hooded man while armed with a big handgun and lead the hooded man into the house.  (RT at 1208-1209, 1215.)  Ms. Bustos also testified that Petitioner brought the hooded man out of the house and into a car after a period of time.  (RT at 1209, 1217.)  Sergio Torres testified that Petitioner confessed to kidnaping a man, taking him to the Merced house, and then transporting him to a canal outside of Merced where Petitioner and co-defendants shot him.  (RT at 1862-1865.)  Lastly, Petitioner attempted to evade police custody and struggled with the police when they went to arrest him for the crime.  (RT at 1585, 1590-1598.)  Additionally, as noted by Respondent, Mendoza's counsel remarked during closing argument that, "[t]his is all or nothing, either they were there or they weren't." (RT at 2857-2858.)  In light of the fact that all the evidence presented against Mendoza also incriminated Petitioner, the jury's finding that Mendoza was guilty of the crime is probative as the jury obviously found such evidence credible and convincing beyond a reasonable doubt.  In light of the jury's verdict and the abundance of testimony evidencing Petitioner's involvement in the crime, the Court does not find that the instruction had a substantial and injurious affect in determining the guilty verdict.  Consequently, Petitioner is not entitled to habeas corpus relief on this ground.

1    **5.      Ground Five: Issuance of CALJIC No. 2.11.5**

2         In his last ground for relief, Petitioner challenges the issuance of CALJIC No. 2.11.5.  That

3    instruction, as given by the trial court, states:

4              There has been evidence in this case indicating that a person other than a
         defendant was or may have been involved in the crime for which that defendants are
5         on trial.
              There may be many reasons why that person is not here on trial. Therefore, do
6         not speculate or guess as to why the other person is not being prosecuted in this trial
         or whether he has been or will be prosecuted. Your duty is to decide whether the
7         People have proved the guilt of each defendant on trial.

8    (RT at 2655.)

9         Petitioner contends that the instruction not to speculate at to why the other persons were not

10   on trial undercut the defense's theory that Ramon Medina or Fierros were the responsible parties,

11   thus violating his right to present a defense.[15]   (Traverse at 26.)  The California Court of Appeal

12   rejected Petitioner's first argument, finding that the instruction that the jury is not to speculate or

13   guess why the other person is not being prosecuted does not foreclose the jury from considering that

14   the unjoined perpetrator is the actual guilty party.  The Court does not find this to be an objectively

15   unreasonable application of clearly established federal law. The interpretation advanced by Petitioner

16   defies the plain meaning of the instruction which forbids only speculation of why the other person is

17   not being prosecution.  It does not forbid consideration of the other person as a perpetrator of the

18   crime.  This is especially true as the trial court further instructed the jury that they "must determine

19   whether Ramon Medina was an accomplice."  (RT at 2669.)  Thus, it is not reasonable to surmise

20   that the jury would have read CALJIC 2.11.5 to mean that Fierros and Median could not be the

21   responsible parties as that would have contradicted the later instruction given by the trial court.  As

22   for any argument that this instruction prohibited the jury from considering the motivation of Median

23   and Fierros in testifying against the defendants, such an argument cannot prevail as the trial court

24

25        [15] Petitioner additionally posits that the instruction diluted the prosecutor's burden of proof.  (Traverse at 26).
     Petitioner does not explain how this instruction lessens the burden the prosecutor bears.  The Court notes that in this case,
26   the trial court explicitly instruct the jury that the prosecution bears the burden of proving beyond a reasonable doubt that
     Petitioner is the person who committed the charged crimes. (RT at 2663.)  Thus, the Court finds Petitioner's argument to
27   be a conclusory allegation that does not merit relief.  *See Cox v. Del Papa*, 542 F.3d 669, 681 (9thCir. 2008) (quoting *James
     v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)("Conclusory allegations which are not supported by a statement of specific facts do
28   not warrant habeas relief")).

U.S. District Court

E. D. California

1   also instructed the jury that they were to consider the existence of bias, interest, or motive in

2   assessing the credibility of a witness.  (RT at 2656.)  Thus, the Court finds that the Court of Appeal's

3   decision was not objectively unreasonable and that Petitioner cannot prevail on this claim.  *See Allen*

4   *v. Woodford*, 395 F.3d 979, 996 (9th Cir. 2005) (finding no reasonable likelihood that the jury

5   understood CALJIC No. 2.11.5 to bar consideration of the witness' motives for testifying in light of

6   instructions on witness bias and instruction that witness was an accomplice whose testimony should

7   be viewed with distrust).

8                                         **RECOMMENDATION**

9            Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

10   DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

11   Respondent.

12           This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United

13   States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of

14   the Local Rules of Practice for the United States District Court, Eastern District of California.

15   Within thirty (30) days after being served with a copy, any party may file written objections with the

16   court and serve a copy on all parties.  Such a document should be captioned "Objections to

17   Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

18   filed within ten (10) *court* days (plus three days if served by mail) after service of the objections.

19   The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The

20   parties are advised that failure to file objections within the specified time may waive the right to

21   appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

22

23   IT IS SO ORDERED.

24   **Dated:    June 1, 2010                                    /s/ John M. Dixon**
                                              UNITED STATES MAGISTRATE JUDGE

25

26

27

28