UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO OROSCO GARCIA,<br><br>Petitioner<br><br>v.<br><br>WARDEN M.S. EVANS,<br><br>Respondent | CASE NO. 1:08-CV-1819 AWI SAB<br><br>ORDER RE: MOTION FOR RECONSIDERATION<br><br>(Doc. 59) |

**I. Background**

Petitioner Francisco Orosco Garcia is proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a July 13, 2004, jury verdict, finding Petitioner guilty of first degree murder (Cal. Penal Code § 187), torture (Cal. Penal Code § 206), conspiracy (Cal. Penal Code § 182), and kidnaping (Cal. Penal Code § 207(a)). Petitioner was sentenced to life without the possibility of parole. The following statement of facts is quoted directly from the unpublished opinion of the Fifth District Court of Appeal

> At approximately 6:30 p.m. on October 1, 2002, Isabel Valdes, a farm laborer living at a labor camp with about a dozen other people, observed a group of five men enter the camp carrying a total of two handguns and a rifle. Those present in the camp were moved outside and ordered face down on the ground. They were told they would be killed if they did not get down on the ground. The group asked for Roberto and Julian. Roberto Ramirez (the victim herein) said "here I am." Two men took the victim away. During the encounter two other people were hit across the head with a handgun. The entire incident took about 10 minutes. Valdes could not describe the men. Valdes testified that the men left in a four-door green vehicle. Valdes recognized exhibit 103 (a rifle seized from Eulalio Mendoza, a.k.a. Pelon) as looking like one of the weapons he saw that evening. The people at the camp did not call the police because they were afraid.

Scott Rufer, an abuser of drugs, rented a house in Merced. His home was a place where various people would come to use drugs. David Medina (David) slept on the couch in the house and his brother, Ramon Medina (Ramon), was an occasional overnight guest.

On October 1, 2002, at 8 or 9 p.m., David and Rufer were watching television in Rufer's house when a car pulled up in the driveway. David walked to the front door when the car arrived. Rufer testified that five people got out of the car and one of them had a pillowcase over his head. The other four men escorted the victim to one of the back bedrooms.

Rufer testified that, when the group entered his home, David spoke to them in Spanish and then told Rufer to sit on the couch, not to move, not to look, and not to breathe. David was armed and unplugged all of the telephones. Ramon arrived after the group of men arrived. Ramon was armed with a shotgun or rifle.

The group stayed in the back room approximately 20 to 25 minutes. The men came out of the back room occasionally during this time. David told Rufer that the victim was a snitch.

An old gray four-door car pulled up and the men left with the victim. Rufer and David remained at the house.

Rufer had no idea until months later of what happened to the victim. Rufer identified Eulalio Mendoza (a.k.a. Pelon) as one of the four men who arrived with the victim. Pelon was a friend of the Medina brothers (David and Ramon). Rufer identified Garcia from a photo lineup on February 2003 as one of the men who was in the group that arrived with the victim. Rufer picked out Santana on the day he testified as one of the people in the group of men who accompanied the victim into Rufer's house. On cross-examination, Rufer said he saw Santana that evening but he was not positive if Santana was with the group. Rufer recognized Mendoza but was not sure if he was at his house with the group of men.

David was originally charged with murder. He entered a plea to false imprisonment and served six months in jail. He testified for the prosecution. David was living with Rufer in October of 2002. On October 1, 2002, he saw car lights. Three men walked into the house. One of the men had his head covered with a shirt or some other material. The other two men were armed. David did not know what was happening. David was told to stand by the door and not let anyone in the house. He did as he was told. The men went into the bedroom and remained there for 20 to 30 minutes. David's brother Ramon was there. The men came out of the room, a car pulled up, and the group got in the car and left. David did not know if Ramon ever went into the room where the men were with the victim. David recognized Garcia as one of the men who was with the victim. In addition, he testified that Pelon was the other man who accompanied the victim into the house.

Ramon was also charged with murder but pleaded guilty to false imprisonment and kidnapping. He received a jail term for his convictions. Ramon testified that he was staying at Rufer's house in October of 2002. Pelon was at the house earlier in the day on October 1, 2002, acting weird and nervous. Later in the day Pelon, Garcia, Mendoza, and Santana arrived at the house in a gray car (pictured in People's exhibit 15). They arrived with the victim. The victim was bleeding.

Ramon testified that the four men escorted the victim to the back room. They all had weapons, including a rifle and handguns. Santana and Mendoza left. Pelon came out and demanded that Ramon go in the back room. He complied. Ramon

saw Pelon kicking the victim in the stomach, ribs, and back. Garcia pistol-whipped the victim on the forehead. Garcia asked the victim questions, including questions about "Queenie" and asked him where certain people were. Pelon and Garcia yelled at the victim. The victim was crying and hurting. He had tears and blood coming down his face. The victim asked them to quit.

Pelon went to the kitchen while Ramon and Garcia remained in the room with the victim. Ramon was sitting in a chair holding the rifle that Pelon handed to him. Ramon held the gun because Pelon demanded that he hold it.6 Pelon had a handgun in his other hand. Pelon, Garcia, and the victim were in the back room between 45 minutes to an hour. Ramon testified that he was only in the room for 25 minutes. The victim was curled up on the bed.

The same car that was used to bring the victim to the house was used to take the victim away. The victim was led out of the house with his face covered with a shirt. Ramon testified that the car belonged to Mendoza. Pelon told those remaining in the house to clean up. They did.

On cross-examination by Santana's attorney, Ramon was asked if he knew Sylvia Brown. He said he had "smoked dope" with her. He was asked if he had told Sylvia Brown that he had set up Santana. Ramon denied saying that to Sylvia Brown.

Maria Bustos (a.k.a. Lupe) lived in a room with her boyfriend at Rufer's home. On October 1, 2002, Rufer, Ramon, David, Pelon, and Bustos were present at the home. According to Bustos, Pelon seemed desperate, as if he was waiting for something. Four men arrived in a four-door car. The men pulled a person out of the car with his eyes covered by clothing. Pelon and Garcia took the victim into the house. The other two men remained outside and left. Garcia had a gun and was holding on to the victim. Ramon had a gun.

Bustos was told to go outside. She did. The men remained in the house for 30 to 60 minutes. The victim was then led outside by Garcia, David and Ramon. Pelon remained inside and called Bustos inside. Once inside Pelon told Bustos to clean up the blood. When the victim was brought inside he was wearing sandals and socks. When he left he was only wearing socks. Ramon kept the victim's sandals.

Merced Irrigation District employees were spraying the canal banks on October 4, 2002, when they saw something floating in the water. They determined that the object was a human body and called law enforcement.

Deputy Sheriff Gerald Dover arrived at the scene. The body was removed from the water. The arms of a shirt had been wrapped around the victim's neck and tied. Five expended shell casings were found on the canal bank. There were shoe impressions in the dirt.

Dr. James Wilkerson conducted an autopsy on the victim, Roberto Ramirez. A black Ramon was shown a weapon at trial and asked if it was the weapon he was holding. He said yes. The record does not reflect the exhibit number of the weapon or the type of weapon that was shown to Ramon. shirt was tied around the victim's neck. It appeared that the shirt had been worn as a hood. The victim had suffered six gunshot wounds. One wound began at the upper chest, another one to the chest, another to the lower chest, one through the arm, one to the left buttocks, and the final gunshot wound was to the upper left thigh. The wounds were excessive for the purpose of killing someone. The cause of death was multiple gunshot wounds.

In addition to the gunshot wounds, the victim had blunt force injuries to his face

and groin. The victim had a laceration to the bridge of his nose and a cut above his left eye. He had bilateral injuries to his groin with the bruise on one side of the groin larger and more purple than the other side. These wounds were inflicted before the victim was shot. The bruises were large and characterized as severe. The doctor testified that it would take significant force to cause the bruising. It appeared from the size of the bruises that the victim was unaware that he was going to receive the blows to his groin. A groin injury is probably the most painful injury a man can receive. The victim suffered at least two blows to his groin.

The victim had alcohol and methamphetamine in his system when he died. Four expended bullets were removed from the victim during the autopsy.

On October 11, 2002 Oakland police officer Allen Miller found a car in an apartment building parking lot in a high crime area. The car was dusty and had been sitting there awhile. The car was returned to Merced County.

Mario Naranjo said he sold the car on May 9, 2002 to two people, Mendoza and his brother Fortino Mendoza. The payments were brought in each month. Sometimes the payments were made by defendant Mendoza, sometimes by Fortino.

The car was searched and checked for fingerprints. Blood was found in the car. Latent print analyst Richard Kinney processed the vehicle. He lifted 22 print cards. Mendoza's fingerprints were on a can of Red Bull found in the car and a container of Prestone interior cleaner. Garcia's prints were found on the inside passenger rear window as well as on a cognac bottle. The fingerprint analyst was only asked to compare the prints of four people (Garcia, Mendoza, Santana, and Pelon) to the prints taken from the car and its contents.

Eight stains inside the car were tested for blood and were positive. Two of the stains were then tested for a DNA profile. The profile of the blood stains matched the victim's and would occur in one in 630 billion Hispanics. DNA on cigarette butts taken from the car matched Mendoza.

Isais Fierros knows the three defendants. Mendoza is Fierros's cousin, he is related to Santana, and he knows Garcia. On October 5, 2002 Fierros went to the Atwater Police Department to report a matter he had telephoned about on October 3 and 4. He told the police that Garcia had tried to take his child and that Mendoza had called him and demanded that he provide him with $50,000. Fierros told the police that Mendoza said he had killed someone in Merced and needed the money to get out of town. Fierros laughed when Mendoza said he was going to kill him. Fierros said that when Mendoza called him the next day and repeated the demand, he took him more seriously. Fierros did not go to the police until "they" attempted to take his child.

Fierros left the police department after making his report. Later that day, Fierros called 911 because Mendoza was following him and he was afraid. Mendoza was taken into custody. Officers found a loaded firearm under the passenger seat of the car he had been driving.

Fierros talked to Mendoza at the direction of the police department. When Fierros asked Mendoza what he had done in Merced, Mendoza replied, "That's nothing." Fierros told Detective Dover that Garcia mentioned that "they" had killed someone. Fierros agreed to wear a wire for the police and talk to Garcia. Fierros asked Garcia if the guns had been disposed of. Garcia said "they had thrown them away."

On cross-examination, Fierros began to change his story. He said that Mendoza

4

wanted the money for Pelon's bail. He testified that he made up stories for the police because he was concerned about his child and he wanted to get Garcia and Mendoza off the street. When he first called the police to tell them that someone had tried to take his child, the officer told him he was not a babysitter and he should make his report in person. Fierros was angry enough with Garcia to tell lies about him and to kill him. Fierros wanted Garcia arrested and off the streets. Fierros told police that Mendoza's car might be found in Oakland, but Fierros did not drive the car there. Fierros testified that Garcia did not confess a murder to him, but perhaps he (Fierros) gave that impression to the police because he needed the police to get Garcia locked up. Fierros testified that Mendoza never asked him for money because of a murder. Fierros was angry with Mendoza and wanted him off the streets. Fierros said he was telling the truth now in court.

On redirect examination, Fierros starting repeating the version of events he told on cross-examination. He testified that Mendoza did call him and ask him for money but Mendoza did not say he was going to kill Fierros nor did Mendoza tell Fierros he had killed a man in Merced. Fierros made up a lot of things he told police with the purpose of getting Mendoza and Garcia off the streets.

Atwater police officer Aaron McKnight testified that he met Fierros in the lobby of the police station at 9:35 a.m. on October 5, 2002. Fierros had called the police department on October 3d, and October 4th. Fierros told Officer McKnight that Mendoza had called him and wanted $50,000 because he had killed a guy and he needed to flee. Fierros told McKnight that Mendoza said he would kill him if he did not come up with the money. Fierros was afraid of Mendoza and also afraid of Garcia because Garcia associated with Mendoza and Fierros thought Garcia was looking for him to do him harm.

Sergio Torres lived in Merced in October of 2002. He knew Garcia and Mendoza from Mexico and met Santana in the United States. Garcia called Torres before October 11, 2002, and asked him to come to his hotel and to bring beer and food. Torres went to the hotel room. Torres was accompanied by his girlfriend, and Garcia's girlfriend was also present. Torres and Garcia drank beer and consumed methamphetamine. When the women went to the store, Garcia told Torres that he, Mendoza, Santana, and Pelon had kidnapped a man, took the man to a house in Merced, and then took the man outside Merced to a canal bank. Mendoza made the victim sit on the canal bank. Garcia told Torres that Mendoza shot the man first and Garcia shot him after Mendoza shot him. Garcia was not sure if he hit the man with his shot. After the victim was shot he fell into the water. Garcia told Torres that they used Mendoza's car.

Garcia told Torres that when they were driving back from the canal they let Santana out of the car because he was scared and did not want to be with them anymore.

Torres testified that he has a methamphetamine problem and has been in trouble with the law. At the time he testified he had three cases pending. Torres's attorney went to law enforcement and said Torres had information he would provide in exchange for a better disposition. Torres talked to law enforcement about what Garcia told him with the hope that he would get help with his own legal problems. He reached an agreement with the prosecution. Charges pending against him were reduced and he was also given help to move away.

On cross-examination Torres disclosed more details about his deals with the prosecution. He was arrested on May 25, 2001 with a pound of methamphetamine. He reached a plea agreement in April of 2002. He pled guilty to possession of methamphetamine with the agreement that he would receive no more than 16

5

months in prison. Between the time of his plea and before sentencing Torres was cooperating with law enforcement to bring them information in the hopes that his sentence would be less than 16 months. His case was continued in July and August. Torres kept asking for more time to gather information. He had not found any information to pass on to law enforcement in October of 2002.

On February 5, 2003, Torres finally came forward with the information he had received from Garcia in October of 2002. In May of 2003 Torres agreed to testify in Garcia's case. In the interim, Torres was arrested in March of 2003 for possession of a handgun. He testified at Garcia's preliminary hearing and was released from jail that day. His new felony charges were reduced to misdemeanors and he received a promise of financial assistance to relocate. He was arrested again in June and August of 2003 and during the current trial in June and July of 2004. He had five cases pending. His cases had been continued with the hope that he would get favorable treatment from the district attorney's office. Torres testified that he came forth with his story regarding Garcia in February of 2003 because Garcia and the other defendants were in jail and he felt safe.

On February 26, 2003 all three defendants were in custody and scheduled for a court appearance. They were transported in a van that had been outfitted with several recording devices. Garcia and Mendoza were placed in the van first. Santana joined them several minutes later.

A tape of the recording was played to the jurors. In the tape Mendoza asked Garcia what he knew and who was talking. Garcia said they are taking fingerprints of everyone who was in the car. Garcia told Mendoza that he told police that they are cousins and sometimes Mendoza would give him a ride to the store. Garcia also said that the police were asking if he knew Pelon and Santana. Mendoza suggested that they say that they do not know anything. Garcia said that is what he has already told them. Mendoza said they should get a lawyer for whomever they find the most fingerprints for. Garcia reported to Mendoza that Rudy and "Queen" (Fierros) were talking and that Santana "is doing well with him [Fierros]." Garcia and Mendoza discussed guns. Garcia said the police got a gun from him and had the gun found in Mendoza's possession. Garcia told Mendoza the police said they had proof who did it and Garcia asked to see the proof.

Garcia continued the conversation and asked why they should pay when they had not done anything. He accompanied this comment with laughter. Santana entered the van. Santana reported to the other two that the "old man" and Ms. Lupe are the ones who were saying everything. Garcia said it's not the old man, it is Ms. Lupe, Santana's pal Rudy and "Tupu" (Torres).

Santana asked where Pelon was. Garcia and Mendoza responded they did not know. Santana suggested they call his "lady" to find him. Garcia said he already knew. Santana suggested that Pelon "could tie those dummies." Garcia said they could not do anything now or they would dig their hole deeper.

The three discussed how cases would go if there was not any evidence. Mendoza asked what was up with "Quini" [Fierros' nickname was Queenie]. Garcia said he did not know where he was. Santana said that "Quini" said he was not going to say anything. Santana said "they" saw Juan, "you guys" [Mendoza and Garcia], and Pelon. Garcia said he told them he would go there for crack. Occasionally throughout the conversations they indicated that they had not done anything.

The three then discovered the listening devices. Garcia said they did not do anything. Mendoza said they should look for the person who did "that." Garcia said

6

they have us here and the person who did it is out. Santana said they don't have any evidence but they are putting it in the paper so they can come and see who did it. Garcia said they aren't going to find evidence because they weren't the ones who did it.

When Ramon Medina testified, he was asked on cross-examination if he had told Sylvia Brown (Sylvia) that he had set up Santana. Ramon replied that he had not. Based on this cross-examination, the district attorney's office investigated calls made by Sylvia's husband, John Brown (John). John was a cellmate of Santana's in jail. This investigation resulted in Sylvia's testifying at trial.

John and Santana were housed in the same cell in the jail. John was allowed to leave jail for one week on a pass. He returned to jail on May 23, 2004 and continued to share a cell with Santana until his removal on June 22, 2004. John's removal from Santana's cell occurred during the trial in this case.

Sylvia testified that when John was out of jail on a one week pass he told her that Santana wanted her to keep Ramon from testifying. Before the plan was put into action, Ramon had already testified. Santana changed his plan and wanted Sylvia to lie and say that Ramon had set Santana up. John and Sylvia were under the belief that they would be paid for doing this.

Sylvia told Santana's investigator that she saw Ramon, and Ramon told her that he had set up the three defendants. When Santana's defense counsel disclosed this information to the district attorney, the district attorney began an investigation.

Sylvia was interviewed by Detective Dover. In her first interview she lied and stuck to her original story that she had seen Ramon. In her second interview with Dover, he confronted her with the tapes of the conversations among Sylvia, John, and Santana in jail. Sylvia then said the story about Ramon was a lie. Sylvia agreed to testify for the prosecution in exchange for a two-year suspended sentence for conspiracy to commit perjury. Santana and John were the alleged coconspirators.

The tape of the telephone conversation among Sylvia, John, and Santana was played for the jury. The telephone call began between Sylvia and John. John told Sylvia that Ramon had already testified, so if Sylvia wanted to come forward and say that Ramon was lying that would be good. Sylvia asked questions of John, and John asked Sylvia if she wanted to talk to Santana. She said yes, and John summoned Santana to the telephone. Sylvia and Santana spoke in Spanish. Sylvia explained to Santana that she knew him from before and that she is John's wife. Sylvia told Santana that if he needed her to go to court she would go. He said yes. Santana said he was there because of Ramon and La Bomba (Torres). Santana said, "That their [sic] telling lies." Sylvia said whatever you need me to do, I'll do. Santana said that if Sylvia did "us" that favor, he would greatly appreciate it. Santana said he already told "him" of the appreciation that he was going to give her. Santana wanted Sylvia's name and address so he could give it to his attorney. Sylvia told Santana that John could provide him all of her details. Santana told Sylvia that when his attorney talks to her she should tell him that the guy told pure lies and that is why he was hiding. Santana also asked Sylvia to look for other girls who know that "they" are liars to come and testify. Santana said he would get in agreement with Sylvia's husband and he appreciated what Sylvia was doing.

Sylvia then spoke to John and told him to give Santana her name and address so he could send his lawyer over. She also said she would get other people to back him up.

> The parties stipulated that the bullets recovered from the victim were fired from the same weapon. It was also stipulated that the weapon used to kill the victim was not the gun seized from Garcia when he was arrested, it was not the gun seized from Mendoza when he was arrested, nor was the murder weapon Pelon's rifle. In addition, the ammunition seized from Santana's home on February 14, 2003, pursuant to a search of his house, was not associated with the death of the victim.
>
> Garcia was arrested at a restaurant. Garcia struggled when he was arrested and had a gun in his waistband of his pants. Garcia got his hand on one of the officer's service weapons during the struggle. The struggle was described as a life or death struggle, lasting three to four minutes and requiring five people to take Garcia into custody.

The habeas petition raised several grounds for relief: ineffective assistance of counsel due to a conflict of interest, denial of severance, refusal to strike witness testimony, and giving of jury instructions based on CALJIC No. 3.16 and 2.11.5. The Magistrate Judge granted Petitioner's request for appointed counsel to aid with his argument regarding the potentially erroneous jury instruction.

Petitioner's attorney then filed a motion to amend, which was in substance a request to file a new claim for relief based on newly discovered evidence shows Petitioner was actually innocent of the crime. Doc. 43. Petitioner provided a declaration in which he states he did not tell prior counsel or the trial court he was not involved because the co-defendants, who Petitioner states in his declaration actually committed the murder, had threatened Petitioner's family. Petitioner's motion to add an actual innocence claim was denied. Doc. 55. Petitioner filed a formal motion to amend the complaint. Doc. 56. That request was denied for lack of timeliness. Doc. 58. Petitioner has filed a motion for reconsideration and supplemental materials. Docs. 59, 60, 61, and 65.

**II. Legal Standard**

"Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law. There may also be other, highly unusual, circumstances warranting reconsideration." School Dist. No. 1J Multnomah County v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993), citations omitted.

**III. Analysis**

In this case, Petitioner seeks to add a freestanding claim based on a theory of actual innocence. Doc. 56, Petitioner 's Request for Leave to File Amended Petition, 3:9-11 ("The exhausted claim which Mr. Garcia requests permission to add raises the actual innocence of the charges for which he was convicted"). The established use of actual innocence in the habeas context is limited and the burden is high: "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar...or, as in this case, expiration of the statute of limitations.... 'petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013), citing Schlup v. Delo, 513 U.S. 298, 329 (1995). That is, showing actual innocence (using the no reasonable juror would convict standard) suffices to permit substantive habeas arguments (ineffective assistance of counsel, involuntary plea, etc.) to be considered by the court notwithstanding the habeas petitioner's failure to satisfy certain procedural requirements which would otherwise bar the claim. None of Petitioner's claims are procedurally barred; he does not seek to use actual innocence as a gateway to allow his substantive claims to be heard. The issue raised in this motion is actual innocence as an independent, freestanding basis for habeas relief.[1]

The U.S. Supreme Court has consistently declined to affirmatively state that a freestanding claim of actual innocence is cognizable. See Herrera v. Collins, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state proceeding"); House v. Bell, 547 U.S. 518, 554–55 (2006) ("We conclude here, much as in Herrera, that whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it"); McQuiggin v. Perkins, 133 S.Ct. 1924, 193 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence"). The Ninth Circuit has appeared to recognize freestanding claims by

---

[1] In one case, the Ninth Circuit termed these two the "procedural actual innocence claims" and the "stand-alone substantive actual innocence claims." Souliotes v. Evans, 622 F.3d 1173, 1185 (9th Cir. 2010). The more popular terminology appears to use the terms "gateway" and "freestanding."

carefully acknowledging the lack of U.S. Supreme Court endorsement while simultaneously noting that the language of that precedent was conducive to such a theory of habeas relief. See Carriger v. Stewart, 132 F.3d 463, 476-77 (9th Cir. 1997); Jackson v. Calderon, 211 F.3d 1148, 1164-65 (9th Cir. 2000).  The legal issue remains a frustratingly open question.

In resolving Petitioner's claim, this court will assume, arguendo, that such claims are cognizable.  In analyzing a freestanding claim (as opposed to using actual innocence as a gateway), the Ninth Circuit has articulated an even more challenging standard for relief, requiring "a stronger showing than insufficiency of the evidence to convict....a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997).  The U.S. Supreme Court has explained that "the threshold showing for such an *assumed* right would necessarily be extraordinarily high." Herrera v. Collins, 506 U.S. 390, 417 (1993), emphasis added.  In Carriger itself, a third party confessed to the crime the habeas petitioner was convicted of but the court found that evidence insufficient. Carriger v. Stewart, 132 F.3d 463, 477 (9th Cir. 1997) ("Dunbar's confession exonerating Carriger does constitute some evidence tending affirmatively to show Carriger's innocence, we cannot completely ignore the contradictions in Dunbar's stories and his history of lying. Accordingly, the confession by itself falls short of affirmatively proving that Carriger more likely than not is innocent").

In this case, Petitioner has not provided sufficient evidence to meet this high standard.  In this motion for reconsideration, Petitioner has provided the declaration of Henry Santana, which gives a version of events consistent with that of Petitioner's own declaration.  They both state: Salvador Mendoza drove them to a house in Merced; they picked up Roberto Ramirez; Salvador Mendoza pulled over on the side of Highway 99 by a canal; Salvador Mendoza and Roberto Ramirez got out of the car while they stayed in the car; they heard gunshots; Salvador Mendoza returned and told them he had killed Roberto Ramirez; Salvador Mendoza then threatened to kill them and their families if they revealed what had happened. Doc. 56-3, Garcia Declaration; Doc. 60-1, Santana Declaration.  Petitioner and Henry Santana do not mention taking part in holding Roberto Ramirez captive at the house.  Their declarations appear to suggest that they had no part

in the kidnap, torture, and murder of Roberto Ramirez.  Declarations are not considered to be a very strong form of evidence. See Herrera v. Collins, 506 U.S. 390, 417 (1993) ("Petitioner's newly discovered evidence consists of affidavits. In the new trial context, motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations").  The evidence that tends to show innocence is limited.

In contrast, Petitioner's convictions were supported by substantial physical and testimonial evidence at trial.  Petitioner's and Henry Santana's version of events is contradicted by ample trial testimony.  Scott Richard Rufer testified that Petitioner was among a group of individuals who brought Roberto Ramirez to the house under duress with a pillowcase over his head. Reporter's Transcript, 705:12-706:10 and 712:26-713:3.  Maria Bustos also testified that Petitioner was among the group that physically escorted a hooded Roberto Ramirez into the house, and that Petitioner was carrying a gun at the time. Reporter's Transcript, 1206:3-13 and 1208:10-1209:9. Additional witnesses similarly provided testimony that Petitioner and Henry Santana actively took part in kidnapping Roberto Ramirez.  Sergio Torres testified that Petitioner directly told him that Petitioner had personally shot at Roberto Ramirez but was not sure if the bullet hit him or not. Reporter's Transcript, 1865:6-16.  The statements of Petitioner and Henry Santana are insufficient to completely outweigh the incriminating evidence.  Petitioner has not demonstrated that he is probably innocent of the crimes.

### IV. Order

Petitioner's motion for reconsideration is DENIED.

IT IS SO ORDERED.

Dated:   January 30, 2015                    _____
                                             SENIOR  DISTRICT  JUDGE